[814 NYS2d 1]

CAMPAIGN FOR FISCAL EQUITY, INC., et al., Respondents, v STATE OF NEW YORK et al., Appellants.

First Department, March 23, 2006

### APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General,* Albany (*Denise A. Hartman, Caitlin J. Halligan* and *Daniel Smirlock* of counsel), for appellants.

*Simpson Thacher & Bartlett LLP,* New York City (*Joseph F. Wayland, Jason S. Stone* and *Chad M. Leicht* of counsel), and *Michael A. Rebell Associates,* New York City (*Michael A. Rebell* and *Martha J. Olson* of counsel), for respondents.

*Davis Polk & Wardwell,* New York City (*Sharon Katz, David B. Toscano, John T. Adams* and *Margaret A. Vining* of counsel), for Alliance for Quality Education, amicus curiae.

*Jeremy Creelan,* New York City (*Samuel Munger* of counsel), for Brennan Center for Justice at New York University School of Law, amicus curiae.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Alan H. Kleinman, Leonard Koerner, Brad M. Snyder* and *Elizabeth S. Natrella* of counsel), for City of New York, amicus curiae.

*Stroock & Stroock & Lavan LLP,* New York City (*Charles G. Moerdler, Faith A. Kaminsky* and *Adam S. Ross* of counsel), and *Carol L. Gerstl,* New York City, for United Federation of Teachers, amicus curiae.

## OPINION OF THE COURT

BUCKLEY, P.J.

This is the third appeal to this Court arising from plaintiffs' challenge to the State's funding of the New York City school system under the Education Article of the New York Constitution (art XI, § 1).

We hold that the State, in enacting a budget for the fiscal year commencing April 1, 2006, must appropriate the constitutionally required funding for the New York City schools. Our disagreement with the dissent lies only in our adherence to well-established constitutional doctrine that it is for the Governor and the Legislature, not the courts, to adopt a dollar-specific budget. The record establishes a range of between $4.7 billion and $5.63 billion, a difference of $930 million, in additional annual operating funds, that would satisfy the State's constitutional education funding obligations. We disagree with the dissent that the courts can usurp the budgetary and educational powers of the Governor and the Legislature and preclude them from making that determination.[1]

In calling for periodic, judicially supervised reviews of the amount of education funding, the dissent implicitly acknowledges that ascertaining the cost of the constitutionally mandated education is not susceptible to mathematical certitude, but rather depends, to a significant extent, on estimates.[2] The dissent does not reconcile that basic fact of educational budgeting with its proposed directive that there is one and only one scientifically precise amount of funding and that the State cannot consider any evidence to the contrary. As a unanimous Court of Appeals has stated:

---

1. The dissent questions the effect of a directive that the Governor *and* the Legislature appropriate the necessary funding. As the conjunctive indicates, both must act. Under our executive budgeting system, the Governor proposes a budget, or an "appropriation bill," but it does not become a law, or an "appropriation," until passed by both houses of the Legislature (*see Pataki v New York State Assembly*, 4 NY3d 75, 83-85 [2004]; NY Const, art VII, §§ 2-7).

2. Article VII, § 1 of the New York Constitution provides:
    "For the preparation of the budget, the head of each department of state government . . . shall furnish the governor such *estimates and information* in such form and at such times as the governor may require . . . . The governor shall hold hearings thereon . . . . Designated representatives of [the appropriate] committees [of the Legislature] shall be entitled to attend the hearings thereon and to make inquiry concerning any part thereof" (emphasis added).

"Assuming it were feasible to convert a courtroom into a super-auditing office to receive and criticize the budget estimates of a State with an $11 billion budget, the idea is not only a practical monstrosity but would duplicate exactly what the Legislature and the Governor do together, in harmony or in conflict, most often in conflict, for several months of each year" (*Wein v Carey*, 41 NY2d 498, 504-505 [1977]).

History of the Case

The Education Article of the New York Constitution (art XI, § 1) states, in full: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."

At the conclusion of the first appellate round, the Court of Appeals declared that the Education Article "requires the State to offer all children the opportunity of a sound basic education," consisting of "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury," as well as "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn," "minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks," and "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (*Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 316, 317 [1995] [*CFE I*]).

On the second appeal, the Court of Appeals held that "the opportunity of a sound basic education" means "the opportunity for a meaningful high school education," though not pegged to any particular grade level, Board of Regents standard, or high school diploma eligibility requirement (*Campaign for Fiscal Equity v State of New York*, 100 NY2d 893, 906, 908 [2003] [*CFE II*]).

The Court of Appeals upheld the trial court's findings that various "inputs" (teaching, school facilities, classrooms, and instrumentalities of learning) and "outputs" (school graduation rates and test results) demonstrated that New York City schoolchildren were not receiving the opportunity for the constitutional sound basic education, and that there was a causal link

between the State's current funding system and such failure (*see id.* at 909-925).

With respect to the remedy, the Court of Appeals acknowledged that the judiciary should "defer to the Legislature in matters of policymaking, particularly in a matter so vital as education financing," and that the courts "have neither the authority, nor the ability, nor the will, to micromanage education financing" (*id.* at 925). The Court of Appeals also noted various federal, state, and city education reforms initiated after the close of trial that might provide the opportunity for a sound basic education to more students and thus affect the scope of needed changes to the school funding system (*see id.* at 926-927). The Court directed the State to "ascertain the actual cost of providing a sound basic education in New York City," to reform the current system of school funding and management to furnish every school in the City with the resources necessary for providing the opportunity for a sound basic education, and to "ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education" (*id.* at 930). The Court of Appeals set a deadline of July 30, 2004, a little more than one year after the date of the decision, for defendants "to implement the necessary measures" (*id.*).

Despite the Legislature's thereafter having been called into extraordinary session and passing a budget in 2004 increasing statewide school funding by $740 million, of which $300 million would go to the New York City schools, the deadline passed without an agreement on additional court-ordered funding for New York City schools.

In August 2004, Supreme Court appointed three Referees "to hear and report with recommendations on what measures defendants [had] taken" to follow the directives of the Court of Appeals.

The Defendants' Proposals

At the Referees' hearing defendants submitted a State Education Reform Plan, which proposed $4.7 billion in additional annual funds for the city schools, phased in over five years, plus various accountability reforms. That plan largely drew upon the report of the New York State Commission on Education Reform, the "Zarb Commission,"[3] appointed by the Governor in 2003.

The Zarb Commission had identified three methods of determining the actual cost of providing city schoolchildren

---

3. It was named after its chairperson, Frank Zarb.

with the opportunity for a sound basic education: (1) the "econometric method," which uses a statistical model to estimate the costs associated with different levels of school district performance; (2) the "professional judgment method," which uses panels of education professionals to determine the scholastic elements needed to attain certain goals and then assigns costs to those elements; and (3) the "successful schools method," which examines the expenditures of school districts that meet or exceed performance standards. The Zarb Commission rejected both the econometric method, since it had not been used by any other state, and the professional judgment method, which is based only on hypothetical constructs. The Commission selected the successful schools method as the most reliable, because it is based on actual data from school districts with a proven record of success, and is used by the State Board of Regents.

The Commission retained Standard & Poor's School Evaluation Services, which, using the successful school districts method, calculated an annual spending gap for the city schools ranging from $1.93 billion to $4.69 billion, depending on the standard for measuring a successful school district, the additional expenditures necessitated by special needs students, and the manner of converting "standard" education dollars into New York City dollars.

Standard & Poor's used four different academic achievement standards for identifying a successful school district: (1) the "top performers," that is, the top 25% of the State's school districts as measured by an "Index of Multiple Performance Measures," which is comprised of scores on various state examinations, graduation rates, and high school enrollment retention rates; (2) the state school districts meeting the federal No Child Left Behind Act's performance targets on various examinations for the year 2006; (3) the state school districts meeting the No Child Left Behind Act's performance targets for the year 2008; and (4) the state school districts meeting the "Regents Criteria," where at least 80% of the students demonstrated proficiency on seven Regents examinations.

The successful school analyses produced "base expenditures," which are estimated costs per student. Base expenditures were multiplied by "weightings" for students with special needs. Relying on research literature, Standard & Poor's assigned a weighting of 2.1 to students with disabilities, 1.35 to economi-

cally disadvantaged students, and 1.2 to students with limited English proficiency.[4]

Because the purchasing power of a dollar varies across the state, and the successful schools method examined all of the school districts in the state, Standard & Poor's offered two alternative regional cost factors to determine the cost in New York City dollars: (1) the "New York Regional Cost Index," provided by the State Education Department; and (2) the "Geographic Cost of Education Index," provided by the National Center for Education Statistics.

Finally, Standard & Poor's applied a "cost effectiveness filter" of 50%, the same method used by the New York State Board of Regents, to screen out successful school districts that either spent money inefficiently or spent more than was necessary to provide the opportunity for a sound basic education. Under that approach, Standard & Poor's used the average expenditures of the lower spending half of successful school districts. Since the average achievement levels of the lower spending half of successful school districts closely resembled the achievement levels of the higher spending half of successful school districts, Standard & Poor's concluded that there was little evidence that the additional spending by the higher half led to meaningfully higher achievement levels.

The Zarb Commission found Standard & Poor's methodologies to be valid and recommended increased annual spending within the ranges of that study, phased in over five years. The Commission declined to endorse a specific dollar amount, believing that the decision should be left to the State's elected officials.

In July 2004, the Governor proposed legislation that would adopt the Zarb Commission's recommendations and, using the New York State Regents Criteria as the measure of a successful school district, would increase funding of the city school districts by $4.7 billion annually, phased in over five years. However, that legislation was not enacted. In August 2004, as noted, the Legislature passed, and the Governor signed, a bill to provide $300 million more to the city schools than had been appropriated the previous year.

---

4. Thus, for each $1 spent on a student without special needs, the city schools would have to spend $2.10 for a student with a disability, $1.35 for an economically disadvantaged student, and $1.20 for a student with limited English proficiency. Since the weightings were cumulative, an impoverished student with a disability and limited English would require $2.65 for each $1 spent on a non-special needs student.

The Proposals of Plaintiffs, the City, and the Board of Regents

Plaintiffs submitted to the Referees a report by the American Institutes for Research (AIR) and Management Analysis and Planning, Inc. (MAP), which recommended additional annual expenditures of $5.63 billion. The AIR/MAP study used the professional judgment method (rather than the successful schools method, used by Standard & Poor's), and the Regents Learning Standards as the academic achievement standard (rather than the Regents Criteria).

The City submitted a plan calling for $5.3 billion in additional annual funds and $13.1 billion in capital improvements. The Board of Regents, using the successful schools method, the Regents Criteria as the measure of success, a cost efficiency filter of 50%, the New York Regional Cost Index, and poverty weightings ranging from 1.5 to 2, recommended an increase in annual funding of $4.7 billion, phased in over seven years.

The Referees' Recommendations

In November 2004, the Referees issued their report, recommending additional annual funds of $5.63 billion, phased in over four years, and capital improvements of $9.179 billion over a five-year period. They accepted the Zarb Commission's use of the "successful schools method," and the "Regents Criteria" as the appropriate achievement standard, but rejected the 50% cost effectiveness filter (or any cost effectiveness filter), recommended a weighting of 1.5 for low income students rather than 1.35, and proposed modifications to the Geographic Cost of Education Index calculations. The Referees recommended a costing-out study every four years, "until it becomes clear that reforms to the State's education finance formulas have rendered such studies no longer necessary to assure all New York City students the opportunity for a sound basic education." The studies would be designed and supervised by the Board of Regents, with an opportunity for the parties to be heard, and would incorporate both the successful schools method and the professional judgment method. Similarly, there would be a facilities review every five years. The Referees recommended against the State's proposed Office of Educational Accountability, but endorsed the parties' agreed-upon accountability enhancements. Finally, the Referees recommended leaving to the State the decision of how much of the additional funding should be paid by the City. Supreme Court confirmed the Referees' report. We conclude that the confirmation should be vacated.

The Referees determined that the "Regents Criteria," the achievement standard utilized by the State and the Board of

Regents, was an appropriate measure of student success, and not the "Regents Learning Standards," which had been found to exceed a sound basic education by *CFE II* (100 NY2d at 907-908).

The Referees rejected the 50% cost effectiveness filter as "both unsupported and arbitrary." However, there was no evidence to support the Referees' apparent assumption that every successful school district spends only the minimum amount necessary to succeed under the Regents Criteria. On the other hand, the Board of Regents based its adoption of the identical cost-efficiency factor upon "a careful examination of characteristics of these two groups of successful school districts," which demonstrated that the higher spending districts had "chosen to offer more than a sound basic education." More importantly, the record establishes that the academic performance of the successful school districts in the lower spending half was nearly the same as that of the higher spending half of successful school districts, which in itself indicates that the efficient use of funds produces results. In recommending a multiyear phase-in to enable the "efficient planning to use prudently the additional funding," the Referees acknowledged that efficiency is a legitimate concern. Although several testifying witnesses criticized the use of any cost efficiency filter, and others would have used a formula different from the one adopted by the State, the Board of Regents, to whom the Referees deferred as experts in other matters, used the same 50% filter. The Referees were also concerned that the filter has the effect of eliminating most of the school districts in Westchester and Nassau, counties that border New York City and thus resemble the City in the concentration of students who are not English proficient and in the higher regional costs, particularly in hiring and retaining capable teachers. However, the weightings (representing extra funding) for students with limited English proficiency and the geographical cost indexes are designed to address just such factors.

The Referees found "only limited support in the record" for the weighting of 1.35 for low income students, because it was not focused on the specific circumstances of the city schools. The Referees attached "much greater probative value" to the weighting recommended by the Board of Regents and implicit in the AIR/MAP study, on the ground that they purportedly were focused on New York City. But as the Referees recognized, by their own characterization, the State's weighting assessment

had record support. In such circumstances, as with the cost effectiveness filter, Supreme Court should not have substituted the Referees' opinion for that of the State on an issue that was clearly debatable. As a consequence, Supreme Court converted a factor that was arguable and reasonable for the Legislature and Governor to consider into an incontrovertible fact. As long as the State's choices remained within the range of professionally accepted practices in determining the costs of a sound basic education, Supreme Court should have left the conclusions for legislative and gubernatorial consideration and determination.

The Referees accepted the use of the Geographic Cost of Education Index to convert statewide costs to New York City costs, but recommended the use of a more updated version and the calculation of costs in 2004-2005 dollars, rather than January 2004 dollars, to account for inflation. Defendants do not contest that modification.

The Standard of Review and Constitutional Requirements

Plaintiffs argue that the Referees' factual findings are owed deference if supported by the record. Concededly, there is evidence in the record to support the Referees' findings with respect to the actual annual cost of providing the opportunity for a sound basic education in the City. There is also, however, a respectable body of evidence to support the State's plan, as found by the Board of Regents, Standard & Poor's, and the Zarb Commission, and as proposed by the Governor. The "burden of proof . . . is on one who attacks the [State's] budget plan" and "[i]t is a formidable burden" (*Wein*, 41 NY2d at 505). That burden has not been met.

Insofar as the Referees derived "comfort" from the "relative convergence" of the yearly additional funding levels recommended by plaintiffs, the City, and the State (as modified by the Referees), they should find repose in the nearly exact correspondence of the calculations of the Board of Regents and the State's unmodified plan. Indeed, one of the most crucial facts established by the record is that reasonable minds can differ as to the actual cost of providing the opportunity for a sound basic education within the city schools. Where there is sufficient evidence to support a range of numbers, it ill behooves the Court to dictate the result; at that point, more than ever, the issue becomes a matter of policy for the other branches of government to determine.

As the Court of Appeals observed in the context of undisputed, serious gaps in rent-control legislation,

"[u]ltimate resolution requires correction at the
legislative level . . . and not at the judicial level.
The courts have limited access to the controlling
economic and social facts. They are also limited by a
decent respect for the separation of powers upon
which our system of government is based" (*Matter
of 89 Christopher v Joy*, 35 NY2d 213, 220 [1974]).

Although that case did not entail a constitutional challenge, the
salient point is that, "[b]ecause of the significant policies
involved," i.e., the conservation of necessary housing, the well-
being of residents, and the property interests of building own-
ers, "they should be resolved by legislative action" (*id.*), and "it
is not the province of the courts to direct the legislature how to
do its work" (*People ex rel. Hatch v Reardon*, 184 NY 431, 442
[1906], *affd* 204 US 152 [1907]).

The doctrine of the separation of powers is so fundamental to
our system of government that the Legislature is precluded
from enacting legislation charging the judiciary with the manda-
tory performance of nonjudicial duties (*see Matter of Richard-
son*, 247 NY 401 [1928] [the Governor and the Legislature may
not instruct a justice of the Supreme Court to investigate and
prosecute a public official pursuant to a provision of the Public
Officers Law]). Just as the other branches of government may
not compel the judiciary to perform nonjudicial functions of
government, the courts must refrain from arrogating such pow-
ers to themselves. Indeed, the New York Constitution prohibits
members of the judiciary from holding "any other public office
or trust" (NY Const, art VI, § 20 [b] [1]), which embodies a
policy "to conserve the time of the judges for the performance
of their work as judges, and to save them from the entangle-
ments, at times the partisan suspicions, so often the result of
other and conflicting duties" (*Matter of Richardson*, 247 NY at
420). As pointed out by the Court of Appeals in *CFE II*, "in a
budgetary matter the Legislature must consider that any action
it takes will directly or indirectly affect its other commitments"
(100 NY2d at 930 n 10). Thus, without the ability or the author-
ity to review the entire state budget, "it is untenable that the
judicial process . . . should intervene and reorder priorities, al-
locate the limited resources available, and in effect direct how
the vast [city and state] enterprise[s] should conduct [their] af-
fairs" (*Jones v Beame*, 45 NY2d 402, 407 [1978]). "While it is
within the power of the judiciary to declare the vested rights of
a specifically protected class of individuals, . . . the manner by
which the State addresses complex societal and governmental

issues is a subject left to the discretion of the political branches of government" (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233, 239-240 [1984] [declining to fashion a remedy that would "embroil the judiciary in the management and operation of the State correction system" (*id.* at 239)]).

The principle is well stated in *Klostermann v Cuomo* (61 NY2d 525 [1984]), relied on by plaintiffs. In *Klostermann*, the plaintiffs, patients and former patients of state psychiatric hospitals, claimed that their constitutional and statutory rights had been violated when they were released into the community without residential placement, supervision, and care, under the least restrictive conditions suitable to their condition (*see id.* at 531-532). The Court of Appeals held that it had the authority to compel the State to exercise its mandatory duties, even if those duties are to be executed through discretionary means, but lacked the power to direct the State to act in a particular manner (*see id.* at 540). The Court could compel the State to perform a legal duty, but not direct how it should perform that duty, since

> "[t]he activity that the courts must be careful to avoid is the fashioning of orders or judgments that go beyond any mandatory directives of existing statutes and regulations [and constitutional provisions] and intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches" (*id.* at 541).

Thus, the Court could direct the State to prepare plans and programs to provide suitable treatment (a mandatory duty), which would also necessarily require the expenditure of funds, but not dictate the specific manner in which such plans and programs operated (discretionary and policy decisions for the Governor and Legislature) (*see id.* at 539-541).

In the Court of Appeals' most recent decision concerning the Constitution's Education Article, *New York Civ. Liberties Union v State of New York* (4 NY3d 175 [2005]), the plaintiffs challenged the failure of the State Commissioner of Education to take affirmative action to determine the causes of failure in their schools and rectify them by classifying them schools under registration review (SURR) (*see id.* at 182-183). The Court refused to compel the Commissioner, "[b]ecause the administrative action of deciding which and how many schools to place under registration review involves an exercise of judgment and

discretion by the Commissioner" (*id.* at 184). Even after a school is placed on the SURR list, the specific actions to be taken rest within the Commissioner's expertise, judgment and discretion (*id.*). The act of choosing among different reasonable funding plans is no less a matter of discretion, and therefore one that does not belong in the courts.

It is not for the courts to make education policy (*see CFE II*, 100 NY2d at 931). The judiciary must take "a disciplined perception of the proper role of the courts in the resolution of our State's educational problems," since "[p]rimary responsibility for the provision of fair and equitable educational opportunity within the financial capabilities of our State's taxpayers unquestionably rests with that branch of our government [the Legislature]" (*Board of Educ., Levittown Union Free School Dist. v Nyquist*, 57 NY2d 27, 49 n 9 [1982], *appeal dismissed* 459 US 1139 [1983]). Indeed, the Constitution expressly states that "*[t]he legislature* shall provide for the maintenance and support of a system of free common schools" (NY Const, art XI, § 1 [emphasis added]). For that reason:

> "The determination of the amounts, sources, and objectives of expenditures of public moneys for educational purposes, especially at the State level, presents issues of enormous practical and political complexity, and resolution appropriately is largely left to the interplay of the interests and forces directly involved and indirectly affected, in the arenas of legislative and executive activity. This is of the very essence of our governmental and political polity. It would normally be inappropriate, therefore, for the courts to intrude upon such decision-making" (*Levittown*, 57 NY2d at 38-39).

The criticism of the dissent herein of an adherence to separation of powers principles ignores the guidelines of *Levittown*, as set forth supra,[5] and draws an erroneous inference from the interplay of the majority, concurring, and dissenting opinions in *CFE I* (*supra*) and *CFE II* (*supra*). The majority in *CFE I* did not reject the doctrine of the separation of powers as a vital component of our governmental structure or hold that the courts can or should conduct independent budgetary hearings, choose among different reasonable estimates, or dictate precise

---

**5.** *Levittown* was reaffirmed in *CFE I, CFE II, Paynter v State of New York* (100 NY2d 434 [2003]) and *New York Civ. Liberties Union v State of New York* (4 NY3d 175 [2005]).

dollar amounts of appropriation. Rather, the majority in *CFE I* expressly stated that its decision "does not extend the State's funding obligations" and that "any discussion of funding or reallocation [of resources] is premature," since "[t]he question of remedies is not before the Court" (86 NY2d at 316 n 4). In *CFE II*, the majority respected the separation of powers doctrine by declining the plaintiffs' request "to initiate a legislative/judicial dialogue" and by limiting its remedy to remanding to the Legislature and Governor to ascertain the cost of providing the opportunity for a sound basic education in the city schools (100 NY2d at 925, 930). The rationale for such forbearance was that the courts must "defer to the Legislature in matters of policymaking, particularly in a matter so vital as education financing," since the courts have "neither the authority, nor the ability, nor the will, to micromanage education financing" (*CFE II*, 100 NY2d at 925).

Moreover, after *CFE II*, the Court of Appeals squarely addressed the budgetary process in *Pataki v New York State Assembly* (4 NY3d at 97), declaring: "to invite the Governor and the Legislature to resolve their disputes in the courtroom might produce neither executive budgeting nor legislative budgeting but judicial budgeting—arguably the worst of the three." Although there was a concurring and a dissenting opinion in that case, both stressed the importance of the separation of powers (*see id.* at 100 [Rosenblatt, J., concurring], at 107 [Kaye, Ch. J., dissenting]). Under the New York Constitution, " 'the executive and legislative branches of government . . . are the sole participants in the negotiation and adoption of [a] budget' " (*Saxton v Carey*, 44 NY2d 545, 550 [1978], quoting *Hidley v Rockefeller*, 28 NY2d 439, 445 [1971, Breitel, J., dissenting]). The fact that certain legislators might hope that the courts will take control of educational budgeting, as reported in various newspapers cited by the dissent herein, is of no moment. The allocation of budgetary powers set forth in the Constitution is not "a requirement which may be waived if the executive and legislative branches agree on it" (*New York State Bankers Assn. v Wetzler*, 81 NY2d 98, 104 [1993]). To the contrary:

> "The object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers. The safety of free government rests upon the independence of each branch and the even balance of power

between the three. . . . It is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself" (*id.* at 105, quoting *People ex rel. Burby v Howland*, 155 NY 270, 282 [1898]). For the foregoing reasons, the Court should not substitute its own budgetary calculations for those of the other branches.

It is undisputed that the State has failed to appropriate an adequate amount of funding to meet its educational mandate as outlined in *CFE II*. However, that neglect does not give the Court the authority to participate in budget negotiations or, absent a constitutional failing, to exercise a veto power over the State's calculations of the cost of a sound basic education. The fact that the other two branches of government have not remedied constitutional failings in the past does not authorize the courts to commit their own constitutional violations now.

Mindful of these constitutional and institutional constraints, the Court of Appeals in *CFE II* was careful to seek a "less entangling" remedy (*CFE II*, 100 NY2d at 925). By requiring judicial approval of the educational budget plan currently at issue, and periodic reviews, Supreme Court would ensure the "decades of litigation" that the Court of Appeals has cautioned against (*id.* at 931). Thus, while the Legislature should consider the Governor's proposal to increase annual funding by $4.7 billion, together with the Referees' recommendation that $5.63 billion per year is the preferable amount to expend, in the final analysis it is for the Governor and the Legislature to make the determination as to the constitutionally mandated amount of funding, including such considerations as how the funds shall be raised, how the additional expenditures will affect other necessary appropriations and the economic viability of the State, and how the funding shall be allocated between the State and the City.

Contrary to the dissent's repeated characterization, this directive does not merely urge the Governor and the Legislature to consider taking action. They are directed to take action. The matter for them to consider is whether $4.7 billion or $5.63 billion, or some amount in between, is the minimum additional annual funding to be appropriated for the city schools.

Although the State's proposal originally projected a five-year phase-in, the passage of time since the plan was presented indicates that a four-year period would now be in accord. A

judicial decree enjoining the Legislature to spend the higher of the two reasonable figures is all the more unwarranted in light of the fact that the increased spending is to be phased in over the course of several years, which thus enables the Governor and the Legislature to revisit the issue and adjust the amount upward or supplement it in future sessions, should they determine, in the exercise of their constitutional responsibilities, that more is needed.

Plaintiffs' reliance on *Montoy v State* (279 Kan 817, 112 P3d 923 [2005]) for the proposition that the courts should review legislative funding determinations is misplaced. In that case, the Supreme Court of Kansas directed the State Legislature to implement an increase in annual school funding of $285 million, and rejected the State's appropriation of $142 million as inadequate, because: there was no study or other evidence to support the State's amount; the higher amount was derived from a study commissioned by the Legislature itself to determine the actual costs of a constitutional education; that study was the only evidence submitted to the court; and the Kansas State Department of Education supported the study (*see* 279 Kan at 829-830, 839, 844-845, 112 P3d at 931-932, 937, 940). By contrast, in the instant matter, New York State's proposed annual funding amount has substantial record support, including the studies of the Zarb Commission and Standard & Poor's, as well as the New York State Board of Regents.

The Referees adopted plaintiffs' proposed $9.179 billion five-year capital improvement plan to address overcrowding, reduce class sizes, provide computers and other technology, and create libraries, laboratories, and auditoriums. Defendants have neither presented evidence concerning the expected cost of capital projects nor outlined a basic plan. Rather, defendants maintain that all of the City's needs will be satisfied by a project-by-project assessment under the existing building aid program, together with some accountability reforms. That assurance, considered in conjunction with the City's endorsement of plaintiffs' plan and the State's failure to refute it or offer an alternative, indicates that the finding of Supreme Court with respect to a capital plan was not erroneous.

As the Referees found, the accountability system of the Board of Regents is widely recognized as one of the best in the nation, and an Office of Educational Authority may well be an unnecessary bureaucratic expense, but to the extent Supreme Court's order may be read as prohibiting the State from establishing

such an entity, it exceeded its authority. Such a ban would be based not on any constitutional clause, operation of law, or strong public policy, but only on Supreme Court's personal view as to the preferable allocation of resources and administrative responsibilities.

Defendants are directed to act as expeditiously as possible to implement a budget that allows the city students the education to which they are entitled. Accordingly, the order of the Supreme Court, New York County (Leland DeGrasse, J.), entered on or about March 16, 2005, which, inter alia, granted plaintiffs' motion to confirm the Referees' report, denied defendants' cross motion to reject the report in part, and directed defendants to implement a funding plan to provide the New York City School District with at least $5.63 billion in additional annual operating funds, phased in over four years, to conduct quadrennial reviews of the cost of providing the opportunity for a sound basic education to all public school students in New York City, to expend a minimum of $9.179 billion on capital improvements over the next five years, to conduct capital improvement funding studies every five years, to enhance the current system of educational accountability by developing a comprehensive plan setting forth the precise management reforms and instructional initiatives that the Department of Education will undertake to improve student achievement, and to ensure that the Department of Education issues an annual Sound Basic Education Report, tracking additional spending and student performance, should be modified, on the law and the facts, to vacate the confirmation of the Referees' report; to direct that, in enacting a budget for the fiscal year commencing April 1, 2006, the Governor and the Legislature consider, as within the range of constitutionally required funding for the New York City School District, as demonstrated by this record, the proposed funding plan of at least $4.7 billion in additional annual operating funds, and the Referees' recommended annual expenditure of $5.63 billion, or an amount in between, phased in over four years, and that they appropriate such amount, in order to remedy the constitutional deprivations found in *CFE II*, and that, in enacting such budget, the Governor and the Legislature implement a capital improvement plan that expends $9.179 billion over the next five years or otherwise satisfies the city schools' constitutionally recognized capital needs, and otherwise affirmed, without costs.

SAXE, J. (dissenting). The majority views the separation of

powers doctrine as precluding the IAS court from affirmatively directing the Legislature to take the specific steps necessary to carry out the previous mandate of the Court of Appeals (*see Campaign for Fiscal Equity v State of New York*, 100 NY2d 893, 905 [2003] [*CFE II*], *modfg* 295 AD2d 1 [2002], *revg* 187 Misc 2d 1 [2001]). In this way, it allows a festering constitutional problem of enormous dimension to continue indefinitely.

While it accepts that the shortfall in the funds needed by the New York City public schools in order to provide all its students with the opportunity to obtain a sound basic education comes to at least $4.7 billion, if not $5.63 billion, the majority limits itself to asserting that in enacting a budget for the fiscal year commencing April 1, 2006, the State "must appropriate the constitutionally required funding" and directing the Governor and the Legislature to "consider" a funding plan in that range.

Remanding this matter back to the Legislature and Governor with the general and inadequate directive that they now "appropriate the necessary funding" is insufficient at this juncture. First, given our executive budgeting system (*see Pataki v New York State Assembly*, 4 NY3d 75 [2004]), it is not clear exactly what the majority's direction to appropriate funding requires: is it the Governor's proposal of an appropriation bill, the Legislature's enactment of such a bill, or both? Second, in the face of the Legislature's proven inability to agree upon the level of appropriation it was willing to enact in order to comply with *CFE II*, the fact-finding ordered by the IAS court, and the exact finding made, was clearly necessary. The appropriate step now is for this Court to uphold the confirmation of the Referees' findings and the affirmative direction that defendants enact legislation making the specified allocation in their budget.

It bears emphasis that the Court of Appeals, in *CFE II* (*supra*), directed that by July 30, 2004, the Legislature and the Governor were to not only ascertain the cost of providing the opportunity for a sound basic education in the city schools, but also to *ensure, through "enacting appropriate reforms," "that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education"* (100 NY2d at 930 [emphasis added]). It was only when that deadline had come and gone without compliance that plaintiffs asked the court to do, or order, that which defendants seemingly could not. The IAS court therefore, through the appointment of Referees, itself ascertained the cost of providing the opportunity for a sound basic education in the city schools, and then defined the exact

terms of the legislative reform which would, if enacted, ensure "that every school in New York City would have the resources necessary for providing [it]" (*id.*).

The majority asserts that "in the final analysis it is for the Governor and the Legislature to make the determination as to the constitutionally mandated amount of funding." However, the majority ignores the fact that the deadline for making that determination has already passed without the Legislature successfully enacting such legislation. Indeed, the Legislature has proven itself unable to either agree upon the necessary level of constitutionally mandated funding or to make provision for its allocation, and its failure has continued both during and after the period of time that the Court of Appeals allotted for it to act. The majority's directive, aside from pointing to the numbers that have been in defendants' possession for over a year, in effect accomplishes no more than what the Court of Appeals already did when it directed the enactment of appropriate reforms providing that the schools be given the necessary financial resources. Even the majority's apparently definitive "hold[ing]" that the State must "appropriate the constitutionally required funding," is in effect illusory. The Governor has already proposed such an appropriation to the Legislature in July 2004. The Legislature showed itself to be unwilling or unable to enact the bill. In now telling the Legislature to "appropriate the constitutionally required funding," the majority assumes that the Legislature will, upon that direction, be capable of agreeing internally, and with the Governor, on an amount, when it has already demonstrated that it is unable to do. The range of amounts specified by the majority does not change anything; this is the same information the Legislature had before it in 2004.

The majority's "direction," at this juncture, leaves the students of the New York City public schools without any more of a remedy for this substantial constitutional violation than they had on July 31, 2004, the day noncompliance with the Court of Appeals' prior directive was clear. I am unable to read the majority's decretal paragraph as containing the type of clear and exact directive that, if ignored, may be the subject of enforcement proceedings. Without that type of clarity, it merely amounts to a suggestion to consider taking action, an illusory and possibly unenforceable remedy.

The majority also asserts that the failure of the other two branches of government to remedy constitutional failings "in

the past" does not authorize this Court to commit what it terms constitutional violations of our own. But, the "constitutional failings" of which we speak are current and ongoing, not simply "in the past," and there is no indication that they will be remedied unless and until those branches of our state government have a clear and exact directive as to what they must do to rectify the violation. By framing the discussion, and the purported remedy, as it does, the majority is consigning the schoolchildren of New York to further constitutional violations and neglect. Under these circumstances, where the legislative and executive branches of government have repeatedly failed to confront and solve a problem of state constitutional dimension, it is the obligation of the judiciary to assert its historic role.

The order of the Supreme Court, which confirmed the Referees' findings and directed the implementation of a funding program in accordance with those findings, was in all respects fully supported and proper, and ought to be affirmed.

In the prior appeal, the Court of Appeals upheld the finding that many of the 1.1 million children attending public schools in the City of New York were not receiving the opportunity to obtain a "sound basic education" as required by article XI of the New York Constitution (*see CFE II*, 100 NY2d at 905). The Court, while aware of the need to defer to the Legislature in matters of policymaking, nevertheless recognized the need to ensure a meaningful remedy for the constitutional violation (*id.* at 925). It therefore directed the State to (1) "ascertain the actual cost of providing a sound basic education in New York City," (2) "address the shortcomings of the current system by ensuring . . . that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education," and (3) "ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education" (*id.* at 930). The Court imposed a deadline of July 30, 2004 (*id.*).

Attempts were made to comply with these directives, particularly on the part of the Governor. In September 2003, the Governor appointed the State Commission on Education Reform (Zarb Commission). On March 29, 2004, the Zarb Commission released its final report, indicating that a funding increase in the "range of $2.5 billion to $5.6 billion is a good place to start." In July 2004, the Governor proposed legislation contemplating a total increase of up to $4.7 billion over five years; this bill provided that $2 billion would be contributed by the State, with

the remainder made up of New York City funds and an expected increase in federal and state aid. The State Assembly also proposed a bill which called for an increase of $6.1 billion in operating funds and $1.3 billion as the State's share of a $2.6 billion capital fund.

However, although the Governor called the State Legislature into extraordinary session in an effort to take the action directed by the Court of Appeals, the Court's July 30, 2004 deadline passed without the Legislature's enactment of either the Governor's proposal or any other bill.*

In consequence of defendants' failure or inability to comply with the prior order, upon an application by plaintiffs, the IAS court properly appointed a panel of three distinguished Referees to hear and report with recommendations on the areas in which compliance with *CFE II* was lacking. After extensive hearings, the Referees made six key recommendations, including a four-year phase-in of operational increases totaling $5.63 billion, a review of operational funding in 2008 and every four years thereafter, and a five-year phase-in of capital funding totaling $9.179 billion.

The Referees arrived at the $5.63 billion figure for the necessary operational funds increase by applying the so-called "successful school district" methodology employed by defendants' expert to the particular circumstances presented here. However, they declined to use three adjustment factors suggested by defendants: (1) a 50% "cost efficiency filter," which the Referees properly considered to be insufficiently supported by either the evidence or experts in education finance, (2) a poverty weighting figure based on national, rather than local, data, and (3) an out-of-date regional cost of living index.

Defendants continue to assert on appeal that a sound basic education can be provided for an additional $1.93 billion, but fail to provide support for that number. Indeed, that number is merely part of the calculations contained in the Standard & Poor's (S&P) study intended to set out a range of "spending gap" calculations, specifically, the part of the analysis in which is calculated the average of the bottom-spending 50% of successful school districts. Nowhere did S&P claim that a sound basic education could be provided with the addition of this particular

---

* The Legislature's $300 million increase in the city schools' budget as enacted in 2004, is a small fraction of the amount needed to remedy the violation, and cannot properly be relied upon to establish or imply compliance with the Court of Appeals' directive.

sum, nor did any defendants' witness explain how this sum would successfully do so. Therefore, the majority correctly ignores that suggested amount.

As to the Referees' findings that an increase of $9.179 billion in capital funding is necessary in order for the city schools to provide the opportunity for a sound basic education, I agree with the majority that these findings are fully supported by the record. At the hearing, defendants took the position that the Court of Appeals' decision required *no* increase in capital funding; accordingly, they presented no evidence on the issue. In contrast, plaintiff submitted an extensive capital funding plan, designed by a 22-person expert task force focused on addressing the particular capital funding issues raised by the decision, such as overcrowding, excessive class sizes, and an absence of laboratories, libraries, and computer equipment.

> "The rule is well settled that where questions of fact are submitted to a referee, it is the function of the referee to determine the issues presented, as well as to resolve conflicting testimony and matters of credibility, and generally courts will not disturb the findings of a referee 'to the extent that the record substantiates his findings and they may reject findings not supported by the record' " (*Kardanis v Velis*, 90 AD2d 727, 727 [1982], quoting *Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y.*, 81 AD2d 64, 71 [1981], *revd on other grounds* 55 NY2d 512 [1982]).

Based upon the extensive testimony presented in support of the Referees' plan, including the acknowledgment of defendants' expert that the methodology and general conclusions of the plan were sound, the Referees' findings were fully supported by the evidence before them, and therefore properly confirmed by the IAS court (*see Merchants Bank of N.Y. v Dajoy Diamonds*, 5 AD3d 167 [2004]). The majority's vacatur of the IAS court's confirmation of the Referees' findings, implicitly disaffirming their report and recommendations, is contrary to the applicable, well-settled rule. While CPLR 4403 allows a court to reject a referee's findings or make new findings upon the evidence presented to a referee, this Court merely vacates the confirmation of the Referees' findings. If we are to infer from this result that the entire fact-finding reference was improper, the majority should explain the appropriate action for the IAS court to have taken when faced with defendants' inaction.

Moreover, in regard to the majority's reliance upon *Wein v Carey* (41 NY2d 498, 505 [1977]) to hold that plaintiffs have not met the "formidable" burden placed on one who attacks the State's budget plan, I merely note that since the State's budget plan failed to include the court-ordered reforms providing for the necessary funds, plaintiffs' right to relief has been well established.

Defendants' bare assertion on appeal that the State's building aid program, as enhanced by recent legislation, will produce compliance with the Court of Appeals' directive, is not only too late, but vague and unsubstantiated, and cannot serve to alter the Referees' findings in this regard. Yet, rather than confirming the finding to at least that extent, the majority directs that in enacting the 2006 budget, "the Governor and the Legislature implement a capital improvement plan that expends $9.179 billion over the next five years or otherwise satisfies the city schools' constitutionally recognized capital needs." Here, too, where all the evidence before the Referees supported their findings, instead of upholding the confirmed report and recommendations in order to provide an enforceable solution, the majority phrases its relief so as to leave open the possibility of more years of disagreements and fruitless negotiations.

We should reject defendants' argument that the only appropriate judicial remedy is a declaratory judgment. A declaratory judgment is meant to settle disputes at the outset, before a "wrong" has occurred (*see Klostermann v Cuomo*, 61 NY2d 525, 538-539 [1984]). Here, the "wrong" is an established violation by the State of the constitutional rights of New York City's schoolchildren, and as the IAS court noted, it "has been ongoing for more than a decade." It is long past time to order redress of this long-standing constitutional violation, where those in a position to take action have shown no signs of readiness to do so.

More importantly, however, it is simply misguided to set aside the Referees' well-supported findings and vacate the court's directives in a show of judicial deference to the executive and legislative branches. The necessary deference was shown to the other branches of government when the Court of Appeals gave them over a year to determine what needed to be done and how to do it. Not only did the State Legislature fail to comply with the Court of Appeals' mandate with regard to funding, but it made no efforts to take the other steps required by the Court. Moreover, even defendants' brief acknowledges that the political

branches remain "badly divided" concerning the issue of how much money is necessary to provide the opportunity for a sound basic education to New York City schoolchildren. Commentators have discussed at length the ongoing legislative impasse that pervades New York State's governmental process (*see* Benjamin, *Reform in New York: The Budget, the Legislature, and the Governance Process*, 67 Alb L Rev 1021, 1025 [2004]). Indeed, news reports indicate that key legislators believe that the current political stalemate regarding school funding can only be resolved by a direct order from the courts (*see Passing the buck*, Journal News [Westchester County], May 2, 2004, at 8B; Rothfeld, *School Funding Solution on Hold*, Newsday, Mar. 22, 2005, at A24). Under the circumstances, no further deference is appropriate.

The majority expresses its belief that the separation of powers doctrine precludes us from directing the Legislature to make the appropriation necessary to comply with the findings. However, at this late stage of the process, when the Legislature's unwillingness or inability to enact the necessary legislation is well established, to preclude a specific court directive to the Legislature on the grounds of separation of powers is to virtually preclude enforcement of the Court of Appeals' decision in *CFE II*.

I recognize that in the ordinary course of governmental operations, the process of funding and appropriation is strictly in the hands of the Governor and the Legislature; I do not disagree with the majority's view of the vitality and importance of the separation of powers doctrine (*see* NY Const, art VII, §§ 2, 3, 4; *see also Pataki v New York State Assembly*, 4 NY3d at 81-86). Of course, our constitutional scheme does not contemplate the judiciary determining or directing appropriations in the normal course of government.

Nevertheless, these standard procedures must give way once it has been determined that (1) the level of spending by the Governor and the Legislature on public school education is so insufficient that it results in a violation of constitutional dimension, and (2) the coordinate branches of government have shown themselves to be unable to remedy the violation in the absence of a court directive. If, as defendants suggest, the judiciary is not permitted to direct the coordinate branches to exercise their appropriation authority so as to remedy the violation, we are left with a potentially unresolvable severe constitutional violation.

The recent case of *New York Civ. Liberties Union v State of New York* (4 NY3d 175 [2005]), cited by the majority, does not stand for the proposition that the court may not take action to remedy the uncorrected unconstitutional level of funding. The Court there affirmed the dismissal of a proceeding seeking to compel the Commissioner of Education to designate certain schools as "schools under registration review" and to take corrective action with respect to those schools; the Court held these tasks to be discretionary in nature and therefore not amenable to CPLR article 78 review. The majority here, in asserting that "[t]he act of choosing among different reasonable funding plans is no less a matter of discretion, and therefore one that does not belong in the courts," fails to take into account that a constitutional violation has already been established, and legislative remediation directed, and that the Legislature had a full opportunity to "choos[e] among different reasonable funding plans," but failed to do so.

To the extent the majority seeks to imply that once several reasonable funding plans have been presented, only the Legislature may decide which plan to adopt, this would have been true if the Legislature had actually made such a decision. For instance, had the Legislature enacted a funding increase of $4.7 billion, based upon a reasonable analysis and assessment of the facts and circumstances, it would have been inappropriate for the court to conduct its own assessment of the evidence and come to a different factual conclusion, unless it first determined that the assessment adopted by the Legislature was irrational or unreasonable. But, the Legislature's failure to act created the need for the Court to step into the breach and conduct the analysis and make the findings the Legislature should have made.

At each step of the way in this litigation, the Court of Appeals has considered the concerns expressed by dissenting justices who protested that the majority rulings would result in a violation of the separation of powers doctrine (*see Campaign for Fiscal Equity v State of New York,* 86 NY2d 307, 341 [1995, Simons, J., dissenting in part] [*CFE I*]; *CFE II*, 100 NY2d at 958 [Read, J., dissenting]). In reasoning that the cause of action should be dismissed at the outset, Judge Simons emphasized that "[t]he courts have the power to see that the legislative and executive branches of government address their responsibility to provide the structure for a State-wide school system and support it but we have no authority, except in the most egregious circumstances, to tell them that they have not done enough"

(86 NY2d at 342). He went on to point out that directing increased state aid requires either cutting other programs' aid, reallocating funds at the expense of other school districts, forcing an increase in local taxes, and "encroach[ing] on the Legislature's power to order State priorities and allocate the State's limited resources" (*id.* at 343). The majority declined to follow this reasoning.

Then, following the determination at trial that the constitutional mandate had been violated, when the Court of Appeals upheld the trial court's findings and directed the State to take action, Judge Read protested in her dissenting opinion that "[i]t is up to the Legislature, as the entity charged with primary responsibility under the Education Article for maintaining the State's system of public education, and the Executive, who shares responsibility with the Legislature, to implement a remedy" (100 NY2d at 958). Nevertheless, the majority of the Court of Appeals mandated that the State provide its public school students with the opportunity to obtain a sound basic education, and upheld the determination that the State's appropriations have been insufficient to provide such an education to New York City schoolchildren.

Despite the misgivings of these dissenting judges, the determinations already made by a majority of the Court of Appeals necessarily assume that it is the obligation of the courts, under such circumstances, not only to detect the existence of constitutionally inadequate school funding, but to direct its remediation. While the Court gave the coordinate branches of government the opportunity to determine for themselves both the extent of the violation and the appropriate remedy, their failure to effectively take action requires the court to exercise its equitable power to ensure that the necessary action is taken.

Notwithstanding the importance of the separation of powers doctrine, when a coordinate branch of government, given the opportunity to remedy a constitutional violation, has shown itself unable and unwilling to take the necessary action to do so, there is ultimately no other option than for the court to ensure that the necessary steps are taken. It is too late for this Court to limit our determination to simply espousing our view as to the range of amounts that would be constitutionally adequate, and directing that an allocation in such a range be "considered" by the Legislature, without actually directing any definitive action.

It is true, as the majority points out, that in initially reinstating the complaint the Court of Appeals observed that—at that

point—"any discussion of funding . . . is premature" (*CFE I*, 86 NY2d at 316 n 4), and that in reinstating the trial court's findings of a constitutional violation after trial, the Court limited its remedy to giving the executive branch time to decide upon and enact remedial measures (*CFE II*, 100 NY2d at 925, 930). However, when the Legislature let the deadline pass without enacting any legislation to remediate the constitutional violation, the circumstances fundamentally changed. Without any reason to believe that the Legislature would comply with the Court of Appeals' order, plaintiffs properly sought the assistance of the IAS court, which properly proceeded to take the steps that the Legislature should have taken. This legislative paralysis has now brought us to the point in this litigation when an order directing the remediation of the constitutional violation has become necessary. In view of the ongoing, persistent legislative inaction, we *must* have the authority to direct the enactment of legislation, rather than merely direct that the Legislature consider taking action; otherwise, there could be no enforceable remedy for a legislative failure to correct its constitutionally deficient expenditure.

Defendants cite to other school funding cases in which, they contend, the courts have abided by the separation of powers doctrine to decline to direct specific spending. However, the cases they cite do *not* preclude such court directives based upon the separation of powers doctrine. Moreover, review of school funding cases in litigation around the country reflects that many courts have specifically considered and rejected this separation of powers argument, where—as here—the coordinate branches of government have demonstrated an unwillingness or inability to make the necessary changes in their education funding to remedy the constitutional violation.

In *Hancock v Commissioner of Educ.* (443 Mass 428, 430, 822 NE2d 1134, 1136-1137 [2005]), one of the cases cited by defendants, the Massachusetts court merely declined to adopt the conclusion of the assigned trial-level judge who held that the Commonwealth was still not meeting its constitutional obligations. Notably, the concurring judge emphasized the trial court's findings that in the 12 years since the court had initially declared that Massachusetts was failing to fulfill its educational obligation (*see McDuffy v Secretary of Exec. Off. of Educ.*, 415 Mass 545, 617, 615 NE2d 516, 554 [1993]), the state had "radically restructured the funding of public education across the Commonwealth based on uniform criteria of need, and dramati-

cally increased the Commonwealth's mandatory financial assistance to public schools" and "spending gaps between districts based on property wealth have been reduced or even reversed" (443 Mass at 432, 433, 822 NE2d at 1138 [Marshall, Ch. J., concurring]). Accordingly, it was not the separation of powers, but the successful remedial action taken by the coordinate branches of government that obviated the need for the court in *Hancock* to take directive action. And, in *Idaho Schools for Equal Educ. Opportunity v State* (140 Idaho 586, 97 P3d 453 [2004]) and *Butt v State of Cal.* (4 Cal 4th 668, 842 P2d 1240 [1992]), both of which were cited by defendants, the courts actually indicated their approval of the implemention of remedial measures by courts "when the Legislature . . . failed to take appropriate action" (*Idaho Schools*, 140 Idaho at 589, 97 P3d at 456).

As to *Hoke County Bd. of Educ. v State* (358 NC 605, 599 SE2d 365 [2004]), relied upon by defendants for the court's remark upon the judicial branch's "limitations in providing specific remedies for violations committed by other government branches in service to a subject matter, such as public education, that is within their primary domain" (358 NC at 645, 599 SE2d at 395), the only remedial directive reversed by the court there was the order requiring the expansion of pre-kindergarten educational programs so that they would reach and serve all qualifying "at-risk" students (358 NC at 609, 599 SE2d at 373). That directive was held to "infringe[ ] on the constitutional duties and expectations of the legislative and executive branches of government" (*id.*). The decision affirmed, however, the directive that the state "assume the responsibility for, and correct, those educational methods and practices that contribute to the failure to provide students with a constitutionally-conforming education" (*id.*). There is no reason to believe that if faced with total inaction following this directive, the North Carolina court would assume itself to be powerless to make any further direction. In fact, it is particularly noteworthy that the defendants there began acting to remedy the constitutional violation immediately after the trial court's decision, and continued to allocate increasing amounts to their high-need districts. There is no indication in that decision that the legislature was viewed as having failed to take the contemplated actions.

In contrast, where courts in other states have observed insufficient progress in the remediation of educational funding failures, they have uniformly made the necessary directives (*see*

*e.g. Montoy v State*, 279 Kan 817, 828, 845-846, 112 P3d 923, 931, 940-941 [2005] [active remediation by judiciary appropriate "(a)s long as such power is exercised only after legislative noncompliance"]; *see also State v Campbell County School Dist.*, 32 P3d 325, 332 [Wyo 2001]; *Lake View School Dist. No. 25 of Phillips County v Huckabee*, 351 Ark 31, 91 SW3d 472 [2002], *cert denied sub nom. Wilson v Huckabee*, 538 US 1035 [2003]).

Defendants' argument that the State's actions over the past decade show an increasing commitment to the State's system of public education and to New York City's schools completely fails to take into account the strong showing that in many respects it is a lack of funding, in amounts reaching billions of dollars, that is largely the cause of the lost opportunity for millions of school-children. Putting in place comprehensive standards, an account-ability system, an overhaul of the teacher certification process, and management reforms, as important as they are, cannot reduce class sizes and provide the needed resources.

The Referees appointed by the IAS court devoted their exceptional abilities to arrive at a carefully reasoned conclusion as to exactly what must be done to correctly remedy the established constitutional violation. The IAS court then care-fully and fully considered the same evidence, and the Referees' reasoning, and properly confirmed their findings. It then took the absolutely necessary step of directing defendants to imple-ment such a plan, including periodic reviews and studies and the development of a comprehensive plan for reforms and initia-tives. Nothing in the court's measured directives overstepped the bounds of accomplishing only that which was necessary. Both the confirmed findings, and the affirmative directives, should be upheld.

SULLIVAN and MALONE, JJ., concur with BUCKLEY, P.J.; TOM and SAXE, JJ., dissent in a separate opinion by SAXE, J.

Order, Supreme Court, New York County, entered on or about March 16, 2005, modified, on the law and the facts, to vacate the confirmation of the Referees' report; to direct that, in enact-ing a budget for the fiscal year commencing April 1, 2006, the Governor and the Legislature consider, as within the range of constitutionally required funding for the New York City School District, the proposed funding plan of at least $4.7 billion in ad-ditional annual operating funds, and the Referees' recom-mended annual expenditure of $5.63 billion, or an amount in between, phased in over four years, and that they appropriate such amount, in order to remedy constitutional deprivations,

and that, in enacting such budget, the Governor and the Legislature implement a capital improvement plan that expends $9.179 billion over the next five years or otherwise satisfies the city schools' constitutionally recognized capital needs, and otherwise affirmed, without costs.