Matter of James v Fariña (2019 NY Slip Op 01729)





Matter of James v Fariña


2019 NY Slip Op 01729


Decided on March 12, 2019


Appellate Division, First Department


Oing, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 12, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Rosalyn H. Richter
Peter Tom
Ellen Gesmer
Jeffrey K. Oing, JJ.


450170/16 5576 

[*1]In re Letitia James, etc., Petitioner-Respondent,
v
Carmen Fariña, etc., et al., Respondents-Appellants, The City of New York, Respondent. 
Legal Services NYC, Mobilization for Justice, Inc. and Partnership for Children's Rights, Amici Curiae. Common Cause New York, Amicus Curiae.



Respondents Carmen Fariña and New York City Department
of Education's appeal from an order of the Supreme Court, New York County (Lynn R. Kotler, J.), entered August 11, 2016, which, insofar as appealed from as limited by the briefs, granted petitioner Public Advocate's application for a summary inquiry pursuant to New York City Charter § 1109, and denied respondents Carmen Fariña and New York City Department of Education's motion to dismiss the proceeding as against them.




Zachary W. Carter, Corporation Counsel, New York (Scott Shorr Richard Dearing of counsel), for appellants.
Public Advocate for the City of New York, New York (Molly [*2]Thomas-Jensen of counsel), for respondent.
Davis Polk & Wardwell, New York (Anne Burton Walsh of counsel), for Legal Services NYC, Mobilization for Justice, Inc. and Partnership for Children's Rights, amici curiae.
Milbank, Tweed, Hadley & McCloy LLP, New York (Robert Christopher Almon and David R. Gelfand of counsel), for Common Cause New York, amicus curiae.



OING, J.


Petitioner, Public Advocate of the City of New York Letitia James, makes this application, pursuant to section 1109 of the Charter of the City of New York, seeking to have respondents Carmen Fariña, the former Chancellor of the New York City Department of Education, and the New York City Department of Education (DOE) appear before Supreme Court for a judicial summary inquiry in which petitioner will inquire about their contract for a computer software system, ostensibly designed to manage special education service records and to generate documentation needed to seek Medicaid reimbursement for these services. Petitioner contends that a summary inquiry is warranted to determine the extent of respondents' failures with respect to such issues, and that these failures amount to a "violation or neglect of duty in relation to the property, government or affairs of the city" under Charter § 1109. This appeal presents three issues for us to consider: the constitutionality of section 1109, which has seemingly been decided as such, the scope of a section 1109 judicial summary inquiry, and the exercise of judicial discretion.
The Individuals with Disabilities Education Act (IDEA) requires schools to provide children with disabilities a "free appropriate public education" that enables them to make academic progress (20 USC § 1400 et seq.). To ensure that each child receives the appropriate education, the IDEA requires schools to create an Individualized Education Program (IEP) for each child outlining, among other things, the needs and progress of each child (20 USC § 1414[d]). These "related services" include, but are not limited to, speech therapy, occupational therapy, physical therapy and mental health counseling services. The fundamental objective of providing these related services is to help maximize each child's ability to achieve his or her educational goals.
From the early 1980s through 2013, DOE used a data system called the Child Assistance Program (CAP) to track the related services provided to special education children. CAP was unable, however, to track and document the services actually received. To remedy CAP's admitted inadequacy, in early 2008, DOE sought to implement the Special Education Student Information System (SESIS), and, accordingly, issued a Request for Proposal (RFP) seeking software and IT solutions to support SESIS. The RFP listed a number of objectives for SESIS: simplification of data entry; improving the quality for IEPs by improving the process for creation and review of IEPs; significantly reducing the cost to manage paper-based records; and improving data integrity. In 2009, DOE contracted with Maximus, Inc. for the design and creation of the software to support SESIS, a software system that, among other things, was supposed to manage the records for children with disabilities and track their IEPs. SESIS was fully implemented at the end of the 2012-2013 school year. Although DOE's contract with Maximus expired in 2015, DOE continues to utilize the its software to support and operate [*3]SESIS.[FN1]
Petitioner, alleging that she has conducted a "lengthy and thorough" investigation, asserts that SESIS is an abject failure in that it does not allow DOE, school officials, teachers and parents to track system-wide compliance or gauge the progress of individual students with IEPs, and it does not supply the necessary documentation the City needs to obtain Medicaid reimbursement, costing the City possibly as much as $100 million per year in lost Medicaid reimbursement. Petitioner asserts that based on conversations with advocates, parents and teachers, SESIS remains difficult to use and is subject to malfunctions, to the detriment of the children in the special education program. There is some anecdotal evidence of SESIS's shortcomings.[FN2] Petitioner maintains that these problems continue to persist and have not been remedied.
In her affidavit supporting the instant section 1109 application, petitioner alleges that respondents "have neglected and violated their duty to provide legally-mandated services to children with disabilities and to protect the city from wasteful contracts" and they "have failed to meet their obligations under city, state, and federal law to ensure that children with disabilities in New York City are receiving their IEP-mandated services." Petitioner goes on to assert that because of the deficient Maximus computer software supporting SESIS, DOE has no meaningful and comprehensive data about IEP compliance, and, as such, it cannot gauge compliance with state and federal requirements. Petitioner points out that these compliance issues disproportionately affect the City's poor neighborhoods.
Through this summary inquiry, petitioner seeks to gather information concerning how DOE tracks its compliance with IDEA and each child's IEP, how it manages records for children with disabilities, and how it spent over $130 million on a software system that simply does not work as intended. Petitioner also claims that as a result of SESIS's shortcomings DOE has been unable to seek Medicaid reimbursement for the special education services. According to petitioner, her investigation indicates that DOE, on behalf of the City, should be claiming more than $500 million in Medicaid reimbursements each year, that since 2012 Medicaid reimbursements for services to students with special needs has dropped significantly, and that DOE failed to recoup $356 million in Medicaid reimbursements between 2012 and 2014. Petitioner asserts that the reason for this reimbursement deficiency can be traced back to SESIS. Her claim is that DOE is unable to file for reimbursement in a systematic or organized way as a result of SESIS's inability to provide proper recording documentation each time the students receive their services.
Essentially, the summary inquiry's focus is on respondents' administration of the special education program  their perceived mismanagement, inefficiency and deficiency. Indeed, petitioner makes a point to note that she is not seeking to convene an inquiry to inquire as to how DOE formulates and reviews a child's IEP, issues that are indisputably educational and pedagogical.
Supreme Court granted petitioner's application, noting that "whether to conduct a section 1109 summary inquiry is a matter within the court's discretion, and the decision should not be reviewed except in a case where there is a clear abuse of discretion'" (Matter of James v Farina, 53 Misc 3d 704, 706 [Sup Ct, NY County 2016], quoting Matter of Riches v New York City [*4]Council, 75 AD3d 33, 39 [1st Dept 2010], appeal dismissed 15 NY3d 735 [2010])[FN3]. It held that the summary inquiry is constitutional, and that the matters subject to the inquiry are not educational and pedagogical, which are areas of State control. As to its holding that the inquiry is not limited to matters involving corruption, Supreme Court found that "based upon the legislative history of section 1109, the legislature intended to broaden the category of acts into which a summary inquiry thereunder may be made" (Matter of James v Farina, 53 Misc 3d at 717). Supreme Court rejected "respondents' characterization of the enactment of section 1109 in 1936 as simply shorten[ing] and streamlin[ing]' the predecessor statute" (id.). In exercising its discretion, Supreme Court found that a section 1109 judicial summary inquiry into the above-noted SESIS problems was warranted and would serve some purpose given that respondents were not presently being investigated by any other agency, department or independent third parties, and that the underlying facts concerning SESIS and the Medicaid reimbursement have not yet been fully developed or disclosed to the public. This appeal ensued.
On appeal, respondents continue to argue that the inquiry provision is facially unconstitutional because it improperly assigns nonjudicial duties to a Supreme Court Justice, which amounts to an impermissible "public trust" (NY Const, art VI, § 20[b][1] [Supreme Court Justices prohibited from holding "any other public office or trust except an office in relation to the administration of the courts, member of a constitutional convention or member of the armed forces of the United States or the state of New York"]). They also argue that enabling a summary inquiry into educational matters violates the separation of powers doctrine because Supreme Court will encroach on pedagogical matters and educational policies, areas that are exclusively within the State's domain. Although these arguments have been addressed in other cases (see e.g. Matter of Mitchel v Cropsey, 177 App Div 663 [2d Dept 1917]; Matter of Green v Giuliani, 187 Misc 2d 138 [Sup Ct, NY County 2000]), they are, nonetheless, worthy of discussion.[FN4]
Respondents' public trust argument is without merit. Courts have held that a summary inquiry is judicial in nature (Mitchel v Cropsey, 177 App Div at 669; Green v Giuliani, 187 Misc 2d at 141-142; Matter of Leich, 31 Misc 671 [Sup Ct, Kings County 1900]). Essential to this finding is the fact that
"[a] justice who acts under section 1534 [section 1109's predecessor] of the charter is called upon to exercise functions much more nearly approaching the judicial. He must determine whether the affidavit makes out a case under the statute; he must decide upon the relevancy of the evidence to the charges contained [*5]in the affidavit, and finally, in aid of the examination, he may punish for contempt  a power essentially judicial"
(Mitchel v Cropsey, 177 AD at 669)[FN5]. Indeed, a judicial summary inquiry "controlled" by a Supreme Court Justice has all the hallmarks of a grand jury proceeding, a quintessential judicial proceeding. In that regard,
"[a] Grand Jury may be empaneled to conduct an investigation into aspects of government operations and issue a report as to its findings. Essentially, in such Grand Jury proceedings a Supreme Court Justice (along with the prosecuting attorney) is limited to the role of a "legal advisor" who does not preside over the proceedings, but rules on questions of law arising during the conduct of the investigation. The Justice reviews the resulting report to ensure that the report is based on the credible admissible evidence presented to the Grand Jury, and that it provides statutory procedural protections to identified or identifiable persons"
(Matter of Green v Giuliani, 187 Misc 2d at 143-144 [internal citations omitted]).
Reliance on Matter of Richardson (247 NY 401 [1928]) for a contrary proposition is misplaced. There, the Court of Appeals had to determine the legality of a state law authorizing the Governor to direct a Supreme Court Justice to conduct a proceeding and file a report with the Governor concerning the removal of the Queens Borough President. The Court held that the law authorizing the investigation was an attempt "to charge a justice of the Supreme Court with the mandatory performance of duties non-judicial" and, as such, violated the public trust provision of the State's Constitution (id. at 410 [Supreme Court Justice is made a delegate of the Governor and a prosecutor]). Unlike Richardson, a section 1109 inquiry does not require a judicial leave of absence, rental of office space, or hiring of staff. The inquiry is public. Critically, a Supreme Court Justice is not subject to the order or the delegate of either the legislative or executive branch of government.
Respondents fare no better with their constitutional infirmity claim under the separation of powers doctrine. That doctrine is the fundamental foundation to our form of government and exists to prevent one branch of government from unconstitutionally encroaching upon another (see Mitchel v Cropsey, 177 App Div at 668-669). Indeed, we have held that
"[t]he doctrine of the separation of powers is so fundamental to our system of government that the Legislature is precluded from enacting legislation charging the judiciary with the mandatory performance of nonjudicial duties. Just as the other branches of government may not compel the judiciary to perform nonjudicial functions of government, the courts must refrain from arrogating such powers to themselves"
(Campaign for Fiscal Equity, Inc. v State of New York, 29 AD3d 175, 185 [1st Dept 2001], mod on other grounds 8 NY3d 14 [2006] [internal citation omitted]). Whether a specific section 1109 judicial summary inquiry violates this fundamental constitutional doctrine is a sui generis determination. There can be no dispute that each section 1109 application must be viewed on its own merits based on all relevant factors, and mandates an inquiry devoted to the particular facts and circumstances, requiring a delicate balancing of the equities between the party seeking the summary inquiry and those subject to the inquiry.
We find that a summary inquiry into areas that do not touch upon policy determinations that concern educational or pedagogic matters, but merely deal with administrative matters, will not violate the separation of powers doctrine (see Matter of Goldin v Greenberg, 49 NY2d 566, 569 [1980] [pupil transportation contracts are not "matters strictly educational or pedagogic"]). On the other hand, when questions concern "the wisdom" of an educator in matters purely involving educational policy, Supreme Court must refrain from crossing the constitutional rubicon (see Matter of Ferrer v Quinones, 132 AD2d 277, 282-283 [1st Dept 1987]).
Here, despite claims to the contrary, petitioner is not seeking to have Supreme Court entangle itself with any educational or pedagogical priorities, or obtain general oversight over the Chancellor's or DOE's powers or discretion concerning these issues. Further, like the Goldin case and unlike the Ferrer case, petitioner is not seeking through this inquiry to have Supreme Court involve itself with how the Chancellor or DOE gathers and processes information in formulating or reviewing a child's IEP, or any of the child's other educational metrics. She merely seeks to inquire into respondents' compliance with their duty under the applicable regulations and statutes concerning the provision of special education services, essentially an inquiry concerning the efficacy of respondents' administration of the special education program. To that end, petitioner's efforts are to create a public record of respondents' means and methods employed in satisfying their obligation to monitor their compliance with the requirement to provide special education services, and their efforts to ensure that the City receives the benefits under the Maximus contract.
These findings also resolve respondents' contention that the subject matter of the present judicial summary inquiry does not involve "any alleged violation or neglect of duty in relation to the property, government or affairs of the city," but one that is within the State's exclusive jurisdiction  namely, public education (Lanza v Wagner, 11 NY2d 317, 326 [1962]). Clearly, this judicial summary inquiry will not have Supreme Court encroach on or supplant the State's power to control educational affairs [FN6]. Accordingly, we hold that the present section 1109 judicial summary inquiry does not encroach upon the executive or legislative branches of government, and, as such, does not violate the separation of powers doctrine.
With the constitutional questions resolved, we now decide whether the scope of section 1109 encompasses an inquiry into respondents' manner of satisfying their duty in the provision of special education services. The legislature enacted the original judicial summary inquiry provision set forth in section 109 as part of "[a]n Act to Reorganize the Local Government of the City of New York" in response to the rampant corruption of the Boss Tweed era (see L 1873, ch 335). It was renumbered in the Greater New York Charter of 1897 to section 1534. In 1936, [*6]through the efforts of a Charter Revision Commission for the City (Commission), the judicial summary inquiry provision, which forms the basis of the instant dispute, was amended [FN7]. For the purpose of this appeal, we need only focus on sections 1534 and 1109.
Section 1534, in relevant part, provides,
"Any member of the municipal assembly, commissioner, head of department, chief of bureau, deputy thereof or clerk therein, or other officer of the corporation or person, may, if a justice shall so order, be summarily examined upon an order to be made on application based on an affidavit of the mayor or of the comptroller, or any five members of the municipal assembly, or any commissioner of accounts, or of any five citizens who are tax payers, requiring such examination, and signed by any justice of the supreme court in the first or second judicial departments directing such examination to be publicly made . . . . Such examination shall be confined to an inquiry into any alleged wrongful diversion or misapplication of any moneys or fund, or any violation of the provisions of law, or any want or mechanical qualification of any inspectorship of public work, or any neglect of duty in acting as such inspector, or any delinquency charged in said affidavit touching the office or the discharge or neglect of duty, of which it is alleged in the application for said order that such member of the municipal assembly, head of department, or other aforementioned officer or person, has knowledge or information . . . ."
Early judicial decisions interpreted the scope of this pre-1936 summary inquiry provision to cover issues involving corruption (see Mitchel v Cropsey, 177 App Div at 663; Matter of Leich, 31 Misc at 671).
In Mitchel, the Appellate Division, Second Department vacated Supreme Court's grant of an application for a summary inquiry of the mayor and officials of the City regarding a railroad contract. In reversing, the Second Department held that the provision was "intended to expose the acts of corruption and raids on the city treasury" and that the issues at hand were "not questions which call for the exercise of the power which long ago the Legislature devolved on justices of the Supreme Court to investigate and expose corruption" (Mitchel v Cropsey, 177 App Div at 670, 672).
In Leich, the petitioner sought a summary inquiry of city officials into alleged violations of Charter § 1533, which prohibited officials from having an interest in companies doing business with the City. In denying a motion to vacate its order directing a summary inquiry and permitting the inquiry to go forward, Supreme Court reasoned that the section 1534 inquiry provision
"was passed to help the rent payers and taxpayers of the city to keep watch on the conduct of their officials, and in the hope of enabling them by publicity to prevent official betrayals of trust which had come to be so persistent and common, and were so low, [*7]base, vulgar and heartless as to make many believe that we had reached an era when the permanent decay of our civilization had set in" (Leich, 31 Misc at 671-672).
Turning to section 1109, it provides, in pertinent part, that
"[a] summary inquiry into any alleged violation or neglect of duty in relation to the property, government or affairs of the city may be conducted under an order to be made by any justice of the supreme court in the first, second or eleventh judicial district,[[FN8]] on application of the mayor, the comptroller, the public advocate, any five council members, the commissioner of investigation or any five citizens who are taxpayers, supported by affidavit to the effect that one or more officers, employees or other persons therein named have knowledge or information concerning such alleged violation or neglect of duty . . . ."
Section 1109 amended section 1534 by eliminating the excess subject-matter language, namely, wrongful diversion or misappropriation of funds, violations of law, unqualified inspectors of public works, neglectful inspectors of public works, and delinquencies touching a public office or the "discharge or neglect of duty." As such, section 1109 merely provides in its current iteration that a summary inquiry may be had when supported by an affidavit that sets forth "any alleged violation or neglect of duty in relation to the property, government or affairs of the city."
Here, respondents argue that the amendment did not expand the scope of an appropriate summary inquiry, and contend that the original purpose and scope of the provision remains the same, namely, that the inquiry is limited to corruption [FN9]. Petitioner argues otherwise. She points out that section 1109 no longer contains explicit or implicit references to corruption or any corruption-related topics, and asserts that the Commission's removal of all such references indicates an intention to broaden section 1109's scope. For support, petitioner relies on commentary by Laurence Arnold Tanzer, the Associate Counsel to the Charter Revision Commission in 1936, concerning the 1936 amendment. According to Tanzer, the original summary inquiry provision was "broadened by the new charter" (Laurence Arnold Tanzer, The New York City Charter Adopted November 3, 1936 With Source Notes, a History of the Charter and an Analysis and Summary of its Provisions, at 133 [1937] [emphasis added]). He further states:
"The new charter adds to the persons who may make the application, the president of the council; permits an inquiry into [*8]any alleged violation or neglect of duty in relation to the property, government or affairs of the city, and provides for the examination of any officer or employee or any other person on allegations that he has knowledge or information concerning such alleged violation or neglect of duty"
(id.). As such, petitioner argues that the present inquiry is within the reach of section 1109. Already finding that the present subject matter of the inquiry does not encroach on the State's exclusive jurisdiction over education, our decision hinges on the interpretation of the scope of "any alleged violation or neglect of duty."
To begin, the pre-1936 language also included "any violation" and "any . . . neglect of duty." In this situation, section 982(c) of the 1938 Charter, now section 1140, provides that to the extent provisions of the new Charter "are the same in terms or in substance and effect as provisions of law in force when this charter shall take effect," such as the wording in sections 1534 and 1109, the "new" language is not intended to be a "new enactment" but is to be "construed and applied" as continuous of the preexisting law, namely, that section 1109's scope continues to be limited to corruption. The only support for the proposition that the Commission intended to broaden the scope of the inquiry is Tanzer's assertion that "[t]he former provisions for summary investigation are broadened by the new charter" (Tanzer at 133). Tanzer, who, as respondents point out, did not claim to speak for the Commission, fails to explain to what extent the scope of the inquiry was broadened. Instead, he merely noted that the revised language broadened who may be subject to the summary inquiry  any employee can now be summarily examined in addition to any officer or person. Indeed, a review of Tanzer's report illuminates the following: he did not identify a single new summary inquiry topic, and he did not mention an intention to explicitly expand the summary inquiry scope from the origins of the original inquiry provision or the judicial interpretation utilized at the time.
On the other hand, since the 1936 amendments, courts continued to interpret the purpose of a judicial summary inquiry to address matters concerning corruption or fraud (see e.g. Matter of Riches v New York City Council, 2008 NY Slip Op 32030[u] [Sup Ct, NY County 2008], affd on other grounds, 75 AD3d 33 [1st Dept 2010], supra [the "sole legislative purpose" of the inquiry provision was to "bring acts of corruption to the public's attention"]; Bloom v Lindsay, NYLJ, Jan 8, 1974 at 19, col 1F [Sup Ct, Kings County 1974] [acts of corruption and fraud]; Devito v Lindsay, NYLJ, June 10, 1971 at 19, col 4F [Sup Ct, Queens County 1971] [corruption or fraudulent activity]; Matter of Moskowitz [Lindsay], NYLJ, July 7, 1970 at 10, col 6T [Sup Ct, NY County 1970] [acts of corruption]; Matter of Greenfield v Quill, 189 Misc 91 [Sup Ct, Kings County 1946] [acts of corruption and raids on the city treasury]).[FN10]
An expansion of section 1109, however, occurred in 2000. In Matter of Green v Giuliani (187 Misc 2d at 138), Supreme Court expanded the scope of the inquiry provision to cover matters concerning alleged official misconduct. There, the issue involved then New York City [*9]Mayor Rudolph Giuliani's repeated statements to the press that disclosed details of the sealed juvenile and criminal record of an unarmed man shot by a New York City police officer in March 2000. The Public Advocate sought a section 1109 summary inquiry against the Mayor alleging that his disclosures were unauthorized and that he might have publicized other similarly sealed information concerning other cases. Through the summary inquiry, the Public Advocate sought to inquire how the Mayor "obtained the information which he made public, whether the information was from sealed records, and whether its release was made without regard to the statutory protection of such records from disclosure under New York State law, in particular, sections 166 and 375.1 of the Family Court Act and CPL 160.55" (id. at 140). The motion court, in permitting the summary inquiry to go forward, found that
"[a]lthough inquiries into financial corruption may have been a primary reason for enacting the summary inquiry provision, the language of the current section 1109 could hardly be broader. It applies to all forms of official misconduct and easily encompasses the unauthorized release of the contents of sealed court records"
(id. at 150 [internal citation omitted] [emphasis added]).
We agree with Green that section 1109's reach includes not only corruption, but "all forms of official misconduct."[FN11] Arguably, in light of Green, section 1109's reach continues to evolve over time to include areas not limited to corruption. The question that remains is whether the section 1109 phrase "any alleged violation or neglect of duty" should be broadened so as to bring within its reach all forms of conduct, including acts that amount to administrative inefficiency, deficiency, or mismanagement. We believe it should not, mindful of the admonition uttered over a century ago:
"It would be intolerable if . . . all the heads of departments of the city could be haled into court and cross-examined by disaffected taxpayers, or even by some other hostile official, with no result except publicity. It is much better that proceedings of this kind should be confined to the legitimate purposes of the law"
(Mitchel v Cropsey, 177 App Div at 672).
Section 1109 is set forth in Chapter 49 of the Charter, entitled "Officers and Employees." Neither that chapter, nor the Charter itself, defines "violation" or "neglect of duty." In the absence of a clear definition, either by statute or case law, we are guided by dictionary definitions because they are "useful guideposts" in determining the meaning of a statutory word or phrase (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 196 [2016]).
The word violation is defined in Black's Law Dictionary as "1. An infraction or breach of the law; a transgression . . . . 2. The act of breaking or dishonoring the law; the contravention of a right or duty" (10th ed 2014). To be clear, the nature of the allegations here are that the Chancellor and DOE have neglected their duties to provide for New York City children with disabilities by utilizing a computer software that does not work. These allegations simply do not translate into a claim that respondents have committed a violation. The crux of this matter then is the meaning of the bedeviling phrase "neglect of duty" and whether the current scope of [*10]section 1109 should be expanded to include the present controversy.
"Neglect of duty" is defined as "[t]he omission of one to perform a duty resting upon him. The neglect or failure on the part of a public officer to do and perform a duty or duties laid on him as such by virtue of his office or required of him by law" (Ballentine's Law Dictionary [3d ed 1969]). The word "neglect" means "[t]o omit to do or perform some work, act, or duty, required in one's business or occupation, or required as a legal obligation, such as that of making a payment . . . . The word does not generally imply carelessness or imprudence, but simply an omission to do or perform some work, duty or act" (Ballentine's Law Dictionary [3d ed 1969]). Given this analysis, the dispositive and critical term that is the focal point of the instant statutory dispute is "omission," and the issue becomes whether one charged with neglect omitted to perform a duty he or she is required to undertake by statute or otherwise. This interpretation makes sense in light of how the phrase "neglect of duty" appears in other provisions of the New York City Charter which address removal of an individual from office or the resolution of disciplinary matters. For instance, the following Charter provisions contain references to neglect of duty:
Charter § 168(b) -— Tribunal for tax appeals:
"The mayor may remove any commissioner from the tribunal for neglect of duty, for inability to perform duties because of mental or physical disability, for malfeasance or for any other just cause . . ." (emphasis added).
Charter § 193 — Removal of commission members:
"A member of the commission other than the chair may be removed by the appointing official only upon proof of official misconduct, neglect of official duties, conduct in any manner connected with his or her official duties which tends to discredit his or her office, or mental or physical inability to perform his or her office, or mental or physical inability to perform his or her duties. Before removal, any such member shall receive a copy of the charges and shall be entitled to a hearing on a record by the office of administrative trials and hearings, which shall make final findings of fact, recommend a decision and submit such findings and recommended decision to the appointing official for final action" (emphasis added).
Charter § 1116(a) -— Fraud; neglect of duty; willful violation of law relative to office:
"Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor . . ." (emphasis added).
Charter § 2602(f) -— Conflicts of interest board:
"Members may be removed by the mayor for substantial neglect of duty, gross misconduct in office, inability to discharge the powers or duties of office or violation of this section . . ." (emphasis added).
Each noted Charter section demonstrates that "neglect of duty" implicates serious improper [*11]conduct and can serve as a basis for, at the very least, disciplinary action [FN12]. We find, under these circumstances, that the term "neglect" requires that averments sufficient to plead "neglect of duty" must, at the very least, allege that there was an omission or failure to carry out an official duty.
With these considerations in mind, we find no legal basis to expand section 1109's reach beyond allegations that clearly fall within the plain meaning of a "violation" or a "neglect of duty," i.e., allegations of an infraction or contravention of the law or a duty, or the outright omission of performance of a duty. We further hold that petitioner's allegations of administrative mismanagement, namely, the inefficient governmental administration of a computer software for SESIS are not sufficient bases to support the instant section 1109 judicial summary inquiry application.
Even if we were to find that petitioner sufficiently alleged a violation or neglect of duty, we find that Supreme Court erred in granting the summary inquiry application (see Matter of Riches v New York City Council, 75 AD3d at 39 [Supreme Court's determination reviewed under the abuse of discretion standard]). Petitioner, by her own allegations, conducted a "lengthy and thorough" investigation concerning respondents' perceived administrative failures, as she is empowered to do so under the Charter. The problems with SESIS have hardly been hidden from public view [FN13]. The record indicates that DOE has publicly acknowledged SESIS's deficiencies,[FN14] and that DOE has engaged in substantial remediation efforts, noted in its detailed response to the [*12]NYC Comptroller's 2013 SESIS audit [FN15]. In fact, in its May 2017 NYC Department of Education report, entitled "NYC Department of Education: SESIS Assessment Report," DOE noted the earlier improvements to SESIS and indicated that a multi-agency task force had comprehensively re-evaluated SESIS and had formulated a comprehensive plan of action.[FN16]
Unquestionably, an extensive public discourse on this issue has taken place, all of which reflect poorly on the Chancellor, DOE and their administration of SESIS. We are hard-pressed to find what further information a judicial summary inquiry would produce (see Matter of Riches v New York City Council, 2008 NY Slip Op 32030[u] [summary inquiry's primary purpose of bringing corruption to the public's attention is no longer necessary where the matter at issue has already received substantial publicity and press coverage]).
We note, however, that Charter § 24 empowers petitioner, as Public Advocate, with extensive and wide-ranging investigatory authority, and authorizes her to hold public hearings. In that regard, Charter § 1123 empowers the Public Advocate to compel attendance of "any council member or other officer or employee of the city" to a convened hearing and failure to appear or testify "shall" result in removal from office or termination of employment. Whether the Public Advocate should pursue this issue and hold public hearings are political questions, which are not for the judiciary to resolve (see Roberts v Health & Hosps. Corp., 87 AD3d 311, 322 [1st Dept 2011], lv denied 17 NY3d 717[2011]).
Accordingly, the order of the Supreme Court, New York County (Lynn R. Kotler, J.), entered August 11, 2016, which, insofar as appealed from as limited by the briefs, granted petitioner Public Advocate's application for a summary inquiry pursuant to New York City Charter § 1109, and denied respondents Carmen Fariña and New York City Department of Education's motion to dismiss the proceeding as against them, should be reversed, on the law and facts, without costs, petitioner's application denied, and respondents' motion to dismiss granted. The Clerk is directed to enter judgment accordingly.
All concur except Renwick, J.P. and Gesmer, J. who dissent in an Opinion by Gesmer, J.




GESMER, J. (dissenting)


I agree with the majority that the summary inquiry sought in this case under New York City Charter § 1109 would not be unconstitutional and would not violate the principle of separation of powers. I also agree that § 1109 is not limited to allegations of corruption, and that a "summary inquiry into any alleged violation or neglect of duty in relation to the property, government or affairs of the City" (New York City Charter § 1109) may be held in relation "to all forms of official misconduct" (Matter of Green v Giuliani (187 Misc 2d 138, 150 [Sup Ct, NY County 2000]).
However, I respectfully disagree with the majority to the extent that it would limit § 1109 to allegations of misconduct that are subject to disciplinary action or that constitute a total omission of performance of duty, as their approach would bar summary inquiries into allegations of a substantial failure to perform a duty which has serious and devastating consequences for the City and its citizens, such as the allegations in this case. I also disagree that petitioner has failed [*13]to state a claim under § 1109, and that a summary inquiry is not appropriate in this case for other reasons. Therefore, in my view, the motion court did not abuse its discretion in granting the petition, and I would affirm.
The Summary Inquiry Provision Was Never Limited to Corruption
Although I agree with the majority that § 1109 is not limited to allegations of corruption, I disagree with its conclusion that the predecessor provision was so limited, or that the current provision was originally so limited, but has "evolve[d]." I address this historical background because I believe, respectfully, that the majority has misinterpreted it, and that this has led it to misapply the current provision in this case by imposing on its plain language a cramped interpretation that is not supported by any binding authority.
When "statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of the words used" (People v Williams, 19 NY3d 100, 103 [2012] [internal quotation marks omitted]). The plain language of the predecessor to the current summary inquiry provision did not limit summary inquiry to allegations of corruption (L 1873, ch 335, article XVI, § 109 [renumbered in 1897 as section 1534 of Title 7]), and there is no binding precedent requiring us to find that it did.
There are only two reported cases addressing the predecessor provision, neither of which is binding on this Court, and neither of which held that the provision was limited to allegations of corruption (Matter of Mitchel v Cropsey, 177 App Div 663 [2d Dept 1917][FN1]; Matter of Leich, 31 Misc 671 [Sup Ct, Kings County 1900][FN2]). To the extent that those decisions suggested in dicta, without citing any authority, that the predecessor provision was adopted in response to, and intended to counter, the corruption of the Boss Tweed era, this Court is not bound by either case [FN3]. [*14]Moreover, even if the historical interpretation in those cases is accurate, that does not necessarily mean that the legislature intended to limit the procedure only to allegations of corruption. Indeed, the original provision's plain language states that it is applicable to "any delinquency charged. . . touching the office or the discharge or neglect of duty. . . ."
To the extent that my colleagues in the majority find that the current summary inquiry provision was originally intended to be limited to corruption and fraud, I disagree. They appear to reach this conclusion on three bases, each of which I find unpersuasive.
First, the majority appears to argue that § 982(c) of the 1936 Charter requires that we read the current summary inquiry provision to have been originally intended to relate only to corruption because it reads the 1897 summary examination provision as having been so limited, and because some of the words in the predecessor provision appear in the 1936 Charter amendment. I disagree with the former conclusion, as discussed above.
Moreover, the provision as it has existed since 1936 is not "the same in terms or in substance and effect as" the provision enacted in 1897 (1936 Charter § 982[c]). The 1897 provision authorized inquiries into four distinct subjects: 1) "wrongful diversion or misapplication of any moneys or fund"; 2) violations of law; 3) inspectors who were unqualified or committed a "neglect of duty"; and 4) "any delinquency charged . . . touching the office or the discharge or neglect of duty. . . ."
In contrast, the provision in place since enactment of the 1936 Charter authorizes summary inquiry "into any alleged violation or neglect of duty in relation to the property, government or affairs of the city. . ." (emphasis added). The 1936 Charter Commission removed all reference to specific acts of corruption that had appeared in the predecessor provision, left in the phrase "neglect of duty," and replaced "violation of the provisions of law" with "violation. . . of duty." Accordingly, by its plain terms, the summary inquiry provision as it has existed since 1936 is applicable to an even broader range of behavior than was the predecessor provision (see People v Williams, 19 NY3d at 103).
Furthermore, the 1936 Charter gave the new title, "Corrupt Practices" to § 887 (formerly a portion of § 1533), which, hewing to the classic definition of corruption, prohibited the giving of money or things of value in consideration for nomination, appointment, election, or employment by the City, and made doing so a misdemeanor. Clearly, "any. . . violation or neglect of duty in relation to the property, government or affairs of the city" is broader than the behavior described as corruption in § 887 of the 1936 Charter.
Second, my colleagues in the majority dismiss the contemporaneous commentary written by the Charter Commission's Associate Counsel, Laurence Arnold Tanzer, which states that the "former provisions for summary investigation are broadened by the new charter" (Tanzer, The New York City Charter Adopted November 1936 with Source notes, A History of the Charter and an Analysis and Summary of its Provisions Together with Appendices, at 133 [1937]). In doing so, they note that Tanzer did not identify specific summary inquiry topics that would be permissible under the new provision, and did not refer to the Mitchel and Leich cases which discussed the predecessor provision.
However, as discussed above, I do not read either case to have limited the predecessor provision to corruption, and it is possible that Tanzer and his colleagues on the Commission did not either. Indeed, Tanzer's placement of his discussion of the provision in the section on [*15]"provisions for information regarding the doings of officers and employees" (id. at 131), rather than the section addressing "Corrupt Practices" (id. at 127), is entirely consistent with the Leich court's statement that the provision's purpose is to promote government transparency. Even if the 1936 Charter Commission had read Mitchel and Leich as the majority does, there was no need for Tanzer to discuss those cases, since the Commission decided not to include in the new provision any of the references to specific corrupt acts that had existed in the predecessor provision and on which those courts had relied in finding that the earlier provision had its roots in a notoriously corrupt moment in the city's history.
Finally, the majority notes that courts have interpreted the current summary inquiry provision to be limited to corruption and fraud. However, there is no controlling precedent requiring that result. Indeed, this Court in Matter of Riches v New York City Council explicitly declined to so hold (Matter of Riches v New York City Council, 75 AD3d 33, 37 [1st Dept 2010] ["our decision does not turn on an analysis of the change" in the 1936 summary inquiry provision's language], appeal dismissed 15 NY3d 735 [2010]). Rather, we affirmed the motion court's denial of a summary inquiry application on the basis that it was unnecessary because of another ongoing investigation and attendant publicity. Justice Catterson, in a dissent joined by Justice Acosta, noted that "the majority does not dispute that by its plain terms, section 1109 simply is not" limited to corruption, and that it "would be folly to construe section 1109 in the same fashion as its 1873 predecessor when the provision has been amended substantively since 1873" (Matter of Riches at 43, 44 [Catterson, J., dissenting]; see also Matter of Green v Giuliani, 187 Misc 2d at 149-150 [holding § 1109 not limited to allegations of financial corruption]).
Ten years earlier, in Matter of Green v Giuliani, Supreme Court granted the Public Advocate's request for a § 1109 summary inquiry into public statements made by Mayor Giuliani about Patrick Dorismond's alleged juvenile and adult criminal record after police shot and killed Mr. Dorismond. Mayor Giuliani had argued that § 1109 was limited to allegations of corruption and misapplication of public funds, and was not applicable to the statements he had made, which appeared to contain information obtained from records that should have been sealed (Family Court Act §§ 166, 375.1; CPL 160.50, 160.55, and 720.35). In granting the petition, the court stated:
"Although inquiries into financial corruption may have been a primary reason for enacting the summary inquiry provision, the language of the current section 1109 could hardly be broader. It applies to all forms of official misconduct and easily encompasses the unauthorized release of the contents of sealed court records.
"It is a fundamental tenet of statutory construction that every word in a statute is to be given effect. Limiting the summary inquiry provision to allegations of financial corruption would, of course do violence to that basic principle of statutory construction" (Matter of Green, 187 Misc 2d at 150 [internal citations omitted]).
My colleagues in the majority read Matter of Green as an "expansion" of the scope of § 1109. However, the Matter of Green court interpreted the current summary inquiry provision according to its plain language, as I believe this Court should do in this case. Matter of Green Does Not Support the Majority's Position
The majority appears to rely, in part, on Matter of Green in reaching its ruling on this case. However, in my view, Matter of Green does not support the majority's conclusions for three reasons. First, the majority notes that the misconduct complained of in Matter of Green was an appropriate subject of a summary inquiry because it involved an area that is "carefully regulated by statute" (Matter of Green v Giuliani, 187 Misc 2d at 147). However, the provision [*16]of special education is even more heavily regulated, by both state and federal statutes, than was the access to sealed records at issue in Matter of Green. Accordingly, by the majority's own reasoning, the misconduct complained of in this case should be an appropriate subject of a summary inquiry.
Second, to the extent that the majority finds that the misconduct complained of must be subject to disciplinary action or other serious sanction, there was no finding in Matter of Green that the Mayor would be subject to any sanction for violation of the juvenile and criminal record sealing statutes. Indeed, the Mayor had argued that confidentiality of the records at issue terminated upon Mr. Dorismond's death, and the court held that, even if this were true, a summary inquiry would still be appropriate in that case (id. at 149).
Finally, Matter of Green also does not support the aspect of the majority's decision which apparently limits the summary inquiry provision to neglect of duty constituting a total failure to carry out an official duty. In Matter of Green, the trial court ordered a summary inquiry based on an allegation that the Mayor had violated or neglected his duty to maintain the confidentiality of juvenile or criminal records of only one person, not of all juvenile respondents and criminal defendants. Similarly, here, petitioner does not claim that respondents have failed to provide any New York City children with disabilities with the free and appropriate education to which they are entitled, or that they have failed to obtain any Medicaid reimbursements for services provided to such children. Rather, she alleges, inter alia, that respondents have violated or neglected their duty by failing to provide Individualized Education Plan (IEP)-mandated services to as many as 31%, and possibly more, of such students, by failing to collect hundreds of millions of dollars in Medicaid reimbursements, and by failing to take steps to remedy their inability to collect and maintain crucial data that would permit them to appropriately administer the provision of special education to over 204,000 children with disabilities in the nation's largest school district.
Petitioner Has Sufficiently Alleged a Violation or Neglect of Duty
The majority asserts that petitioner has not alleged a violation of duty, imposes limitations on the definition of "neglect of duty" under § 1109, and then determines that petitioner's allegations fail to meet that restricted definition. I disagree with all three positions.
First, petitioner repeatedly alleges that respondents have both violated and neglected their duties, which are grounded in various local, state and federal laws and court orders [FN4]. In my view, [*17]we should interpret § 1109 by its plain language. "Violation" generally connotes an affirmative act, and "neglect" is generally a failure to act. Petitioner has appropriately alleged both, since, at this pre-inquiry stage, she may not have enough information to know whether it is respondents' acts or failures to act which have resulted in their failure to provide children with services to which they are entitled and to recoup Medicaid reimbursements.
Second, I disagree with the majority's narrowing of the definition of "neglect of duty." First, the majority finds that, in order to qualify for a summary inquiry, the "neglect of duty" alleged must be subject to disciplinary action or more serious sanction. However, this is inconsistent with the majority's statement that "neglect of duty" must be "an omission to do or perform" a duty. Furthermore, the Charter sections cited by the majority do not guide us in defining "neglect of duty" as it is used in § 1109. Charter § 168(b) gives the Mayor broad discretion to remove tax appeals tribunal commissioners for "any" "just cause," of which "neglect of duty" is but one example. Moreover, this section does not define "neglect of duty." Similarly, Charter §§ 193, 1116(a), and 2602(f) do not define the term "neglect of duty." Moreover, Charter §§ 1116(a) and 2602(f) use intensifiers before the term, thus clearly providing that an extreme form of neglect of duty is required to remove an individual from office. Section 1116(a) provides for removal from office and criminal liability for, inter alia, "gross or culpable neglect of duty" by an officer or employee of New York City leading to the loss of public property. Section 2602(f) provides for removal from office of a member of the conflicts of interest board for, inter alia, "substantial neglect of duty."[FN5]
I also disagree with the majority to the extent that it holds that a petitioner in a summary inquiry case based on "neglect of duty" must allege a total failure to carry out every aspect of an official duty for three reasons. First, the plain language of § 1109 makes clear that "any alleged violation or neglect of duty," without limitation, is subject to summary inquiry (emphasis added). In my view, a failure to fulfill an official duty to any degree that results in significant harm to the City or its citizens is an appropriate subject of a summary inquiry, and petitioner has made such allegations here.
Second, respondents never argued before the motion court that "neglect of duty" is limited in the manner described by my colleagues. Moreover, they never disputed before the motion court petitioner's allegations that they had violated and neglected their duties under state, federal and local law and court order [FN6]. Instead, they argued only that § 1109 was limited to allegations of corruption, an argument that my colleagues in the majority and I have unanimously rejected.
Finally, I disagree with my colleagues' severely cramped view of petitioner's allegations as "acts that amount to administrative inefficiency, deficiency, or mismanagement" consisting of "inefficient governmental administration of a computer software for SESIS." Rather, petitioner alleges that respondents have deprived the City's children with disabilities of an appropriate education and have deprived its citizens of federal funds set aside for that purpose.
To reach that global allegation, petitioner alleges that, as a result of respondents' failure to adequately monitor Maximus in the development of the SESIS software or to take any action to remedy its shortcomings: (1) respondents are not capable of producing citywide data about IEPs necessary to ensure that children are receiving IEP-mandated services; (2) service providers can only provide data to respondents about IEPs with a program that is difficult to use and frequently malfunctions, even to the extent of deleting data that has been entered; (3) children who transfer from one school to another are not receiving IEP-mandated services promptly in their new school; and (4) respondents cannot obtain information necessary for the City to obtain Medicaid reimbursement for IEP-mandated services that are provided. She further alleges that, despite being aware of these problems, respondents have failed over a period of years to remedy their inability to track IEP compliance. As a result, New York City children with disabilities are [*18]delayed in receiving services to which they are entitled, or are not receiving services at all; over $130 million dollars of the City's funds have been spent on the development of software that fails to do what it was intended to do; and the City has been unable to collect $356 million in Medicaid reimbursements between 2012 and 2014 alone.
The majority's attempt to distinguish between "mismanagement" and the failure to perform a duty sets up a false dichotomy in this case, since petitioner alleges that it is respondents' continuing and uncorrected mismanagement that has resulted in the violation and neglect of their duties. Petitioner alleges that, as a result of respondents' failure to monitor Maximus's development of the SESIS software and their failure to act to remedy the resulting inadequacy of the software to monitor IEP compliance, including by finding some other means of doing so, the DOE
"cannot gauge compliance with its state and federal requirements. The result of this lack of data is all too predictable: non-compliance that is concentrated in poor neighborhoods. This discriminatory and harmful outcome is a direct consequence of DOE and Chancellor Fariña's failure to monitor the contractor and to ensure that the city received the benefit for which it bargained."
If the DOE cannot track compliance with IEPs, then it cannot know whether it is fulfilling its duty. Petitioner has determined that it is not doing so. She has further determined that, nearly three years after the Comptroller issued an Audit Report concluding that SESIS failed to provide information that meets state and federal reporting requirements, the DOE failed to take any action to remedy this, and the problem has persisted.
In my view, petitioner has appropriately pleaded that respondents have violated and neglected their duties under federal, state and local law to provide a free and appropriate education, including mandated services, to New York City children with disabilities (20 USC § 1412[a][1], [5]), and to monitor its contractor (New York City Charter § 333[a]) to "assure the prudent and economical use of public moneys. . . and. . . facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost" (New York General Municipal Law § 100-a).
This Matter Has Not Been Sufficiently Illuminated
Finally, I disagree with my colleagues that this Court should reverse the motion court on the basis that a summary inquiry is not appropriate because the matter has been sufficiently illuminated.
First, as we held in Riches, the provision is clear on its face that the motion court has discretion to grant or deny a § 1109 petition, and the motion court's determination "should not be reviewed except in a case where there is a clear abuse of discretion" (Riches, 75 AD3d at 39). Since the motion court has clearly identified the reasons for its determination and has not abused its discretion,[FN7] I would affirm on that basis alone.
Second, to the extent that my colleagues in the majority hold as they do today because they are concerned that summary inquiries not be held where only trivial allegations are made, that concern is sufficiently addressed by exercise of the court's discretion, as provided for in § 1109, which requires consideration of whether the subject of inquiry has already been sufficiently illuminated through other means and whether the significance of the interest at stake, and the potential benefits to the City and its citizens of a summary inquiry justify its cost (see Matter of [*19]Riches, 75 AD3d at 39-40). The fact that, in the more than eight decades since the 1936 Charter provision was enacted, only one summary inquiry application has ever been granted before now (Matter of Green v Giuliani, 187 Misc 2d at 138) indicates that the courts have exercised their discretion appropriately. In my view, the motion court did so in this case, and there is no reason to believe that courts will not continue to do so going forward.
I concur with the motion court that "the underlying facts concerning SESIS and Medicaid reimbursement remain wholly undeveloped" and "largely unknown to the public-at-large," and that the significance of the interests at stake — the right of children with disabilities to receive mandated services - warrant a summary inquiry. In determining whether to exercise its discretion to conduct a summary inquiry on a properly pleaded application, courts consider two factors:
(1) Whether the subject of inquiry has already been sufficiently illuminated through other means, such as by news media or publicly available reports (see Matter of Riches, 75 AD3d at 39-40; Matter of City of New York [Seligman], 179 Misc 505, 508 [Sup Ct, Bronx County 1942]), respondents' concession of the facts (see Matter of Larkin v Booth, 33 AD2d 542 [1st Dept 1969]; Matter of Green, 187 Misc 2d at 151-152; Matter of Greenfield v Quill, 189 Misc 91, 95 [Sup Ct, Kings County 1946]), or an ongoing or recently concluded inquiry into the same subject matter in another forum (see Matter of Riches, 75 AD3d at 39; Matter of City of New York [Seligman], 179 Misc at 507); and
(2) Whether, considering the significance of the interest at stake, the potential benefits to the City and its citizens of a summary inquiry outweigh its cost (see Matter of Riches, 75 AD3d at 40; Matter of Green, 187 Misc2d at 151; Greenfield, 189 Misc at 96; Matter of City of New York [Seligman], 179 Misc at 507).
Here, there have been no extensive governmental investigations into whether, and/or to what extent, SESIS failed to provide the necessary citywide data to provide New York City children with disabilities a "free appropriate public education," to create an IEP for each child, and to receive appropriate Medicaid reimbursements, and into the DOE's failure to obtain the benefit for which it bargained in the SESIS contract. This is in marked contrast to our determination in Riches (75 AD3d at 34-35), where we found that a summary inquiry petition was properly dismissed where the New York City Department of Investigation had issued a report of its findings and an investigation by the United States Attorney's office resulted in grand jury indictments related to the complained of behavior (see also Seligman, 179 Misc at 507-508 [denying summary inquiry petition where the New York City Commissioner of Investigation had issued two reports and a grand jury had issued a presentment and report]).
Furthermore, in Riches, the activity complained of was not ongoing (75 AD3d at 35). In contrast, here, the DOE continues to use SESIS, despite its own report that, as of 2016, at least 35% of children entitled to services were not receiving them, as a direct result of the program's inability to provide data necessary to produce IEPs, ensure service provision, and obtain Medicaid reimbursement (see New York City Department of Education Local Law 27 of 2015 Annual Report on Special Education, Feb 29, 2016, at 5, 26; Kate Taylor, Thousands of New York City Students Deprived of Special-Education Services, Report Says, NY Times, Mar 1, 2016).
As petitioner acknowledges, reports about SESIS were issued by the New York City Comptroller in 2013 [FN8] and the New York City Independent Budget Office in 2016. The DOE [*20]issued a brief internal assessment of SESIS in 2016 [FN9]. In addition, in 2012, the President of the United Federation of Teachers (UFT) testified about SESIS to the New York City Council Committees on Education and Finance. Articles about SESIS were published by the Investigative Fund in 2011 and by the New York Times in 2016.[FN10]
However, these sources, some of them as much as five years old by the time petitioner filed her request for a § 1109 summary inquiry, have primarily concluded only that SESIS does not work well and that, possibly as a result, DOE did not know the exact number of students who were not receiving services mandated by their IEPs. The reports and articles have not provided answers to all of the questions petitioner sought to explore in a summary inquiry. The DOE itself pointed out the shortcomings of the Comptroller's 2013 report, calling it "premature as SESIS was so new" at the time. The Independent Budget Offices' 2016 report is just three pages long and does not address the extent of DOE's compliance with federal IEP and service provision requirements raised by petitioner. Similarly, the brief testimony of the UFT President focused on SESIS's interference with the DOE's ability to obtain Medicaid reimbursements. Finally, the DOE's internal 2016 SESIS assessment is not equivalent to an independent inquiry about a system that is failing the City's students entitled to special educational services and is preventing the City from collecting millions of dollars in Medicaid reimbursements for services that are being provided.
The majority states that the Public Advocate has "extensive and wide-ranging investigatory authority" under the Charter. However, none of the provisions cited by my colleagues gives the Public Advocate the power to subpoena documents and ask questions of a witness under oath, as would be permitted in a summary inquiry. Charter § 24(f) only permits her to monitor city agencies' public information and service complaint systems, including reviewing complaints, and to make "proposals" to improve those systems. She is only authorized to investigate complaints made directly to her, and is further limited in doing so where another agency or administrative body is required to adjudicate such complaints, or where the conduct complained of could result in criminal sanctions. Charter § 24(g) sets forth the procedures the Public Advocate must follow in investigating complaints made directly to her, which include referring complaints deemed to be valid "to the appropriate agency." Charter § 24(h) permits the Public Advocate to "review" city agency programs and issue reports containing "recommendations." However, she must provide the agency with a draft of any such report prior to making it public, and include in any publicly issued report the agency's response (Charter § 24[l]). Although Charter § 24(m) permits the Public Advocate to hold public hearings, it does not permit her to ask questions under oath. If she seeks documents from a city agency, she must first ask the agency to give them to her, and, if they refuse, she may ask "an appropriate [*21]committee of the council to require the production of such records and documents" (Charter § 24[j]).
Petitioner sought information about: (1) the capacity of SESIS to provide citywide data on DOE compliance with IEPs; (2) how DOE measures its performance in providing services to children with special needs; (3) how DOE measures whether it is meeting the requirements of students' IEPs; (4) how DOE ensures that IEPs are provided to a child's school upon transfer; (5) how DOE ensures that required services are provided to a child immediately or soon after transfer to a new school; (6) problems encountered by service providers who are not based in schools who attempt to use SESIS; (7) an explanation for the cause of the significant drop in Medicaid revenue for services to students with special needs; and (8) what if any steps DOE has taken to enforce the contract with Maximus. These questions constitute an appropriate and targeted inquiry tailored to make all of SESIS's capabilities and shortcomings public, which will ensure that reforms will be effective. It does not appear that any of petitioner's questions have been adequately answered. Under these circumstances, and consistent with the purpose of the summary inquiry provision to advance transparency in government, I would find that the motion court did not abuse its discretion, and I would affirm.
Order, Supreme Court, New York County (Lynn R. Kotler, J.), entered August 11, 2016, reversed, on the law and facts, without costs, petitioner's application denied, and respondents' motion to dismiss granted. The Clerk is directed to enter judgment accordingly.
Opinion by Oing, J. All concur except Renwick, J.P. and Gesmer, J. who dissent in an Opinion by Gesmer, J.
Renwick, J.P., Richter, Tom, Gesmer, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 12, 2019
CLERK



Footnotes

Footnote 1:All references to SESIS relate to the Maximus computer software.

Footnote 2:Brief of Amici Curiae Legal Services NYC, Mobilization for Justice, Inc., and Partnership for Children's Rights.

Footnote 3:Supreme Court properly rejected respondents' argument that the application had to be commenced as a special proceeding. Section 1109 merely requires an application be "supported by affidavit to the effect that one or more officers, employees or other persons therein named have knowledge or information concerning such alleged violation or neglect of duty."

Footnote 4:Respondents do not argue that the Chancellor and the DOE are never subject to an 1109 inquiry. Nor can they given the broad language as to who is subject to a section 1109 summary inquiry. In fact, pursuant to section 1109, in addition to "any officer or employee," Supreme Court "may require . . . any other person to attend and be examined in relation to the subject of the inquiry."

Footnote 5:The fact that section 1109 no longer includes contempt power language like that set forth in section 1534, its predecessor, is of no moment. Section 1109, unlike its predecessor, clearly vests jurisdiction over the summary inquiry solely with a "justice of the supreme court," obviating the need to set forth that court's inherent judicial powers.

Footnote 6:For this reason, the State Constitution's Home Rule provision (article IX, § 2[b][2]), which protects a municipality from State encroachment and interference with its "property, affairs or government" absent a home rule message, has no application to the instant dispute (see City of New York v Patrolmen's Benevolent Assn. of City of N.Y., 89 NY2d 380 [1996]).

Footnote 7:The summary inquiry provision was renumbered from section 1534 to section 889, which was later renumbered to the current section 1109.

Footnote 8:The First Judicial District is comprised of New York County. The Second Judicial District includes Kings County and Richmond County. The Eleventh Judicial District includes Queens County and Nassau County.

Footnote 9:Reliance on General Municipal Law § 51 to support the proposition that section 1109 is limited to issues of corruption is misplaced. That statute provides for the prosecution in a plenary action of officers for illegal acts (see Thomas v New York City Dept. of Educ., 151 AD3d 412 [1st Dept 2017]). It provides no guidance as to the scope of a section 1109 summary inquiry.

Footnote 10:We recognize that these cases along with Mitchel and Leich are not binding on us, but at the same we cannot cast them aside (McKinney's Cons Laws of NY, Book 1, Statutes § 72[b]; see Mountain View Coach Lines v Storms, 102 AD2d 663, 665 [2d Dept 1984]; see e.g. Church of St. Paul and St. Andrew v Barwick, 67 NY2d 510, 519 [1986]). They unquestionably serve to provide significant historical and interpretative guidance concerning section 1109's purpose and scope (id.).

Footnote 11:The misconduct alleged in Green falls within the purview of a violation under section 1109. As the Green court pointed out, "access to sealed records is carefully regulated by statute" (187 Misc 2d at 147).

Footnote 12:Although not dispositive, other examples of how "neglect of duty" is used in laws governing the City are instructive. For instance, the term appears in the Administrative Code of the City of New York in the following provisions:
Administrative Code, Title 14 Police, § 14-115(a) Discipline of members.
"The commissioner shall have power, in his or her discretion, on conviction by the commissioner, or by any court or officer of competent jurisdiction, of a member of the force of any criminal offense, or neglect of duty, violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming an officer, or any breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, or by dismissal from the force" (emphasis added).
Administrative Code, Title 15 Fire Prevention and Control, § 15-113 discipline of members; removal from force.
"The commissioner shall have power, in his or her discretion on conviction of a member of the force of any legal offense or neglect of duty, or violation of rules, or neglect or disobedience of orders or incapacity, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct, or conduct unbecoming an officer or member, or other breach of discipline, to punish the offending party by reprimand, forfeiture and withholding of pay for a specified time, or dismissal from the force" (emphasis added).
Administrative Code, Title 16 Sanitation, § 16-106 Removal and suspension of employees.
"The commissioner, in his or her discretion, shall have power to punish any member of the uniformed force who has been guilty of:
1. any legal or criminal offense,
2. neglect of duty,
3. violation of rules,
4. neglect or disobedience of orders . . ." (emphasis added).

Footnote 13:Examples include: a March 2016 report by the New York City Independent Budget Office entitled "Data Problems Plague City's Effort to Claim Medicaid Reimbursement for Services to Students with Special Needs"; an August 2014 Budget and Policy Brief released by the New York City Comptroller entitled "Money Left on the Table  A Review of Federal Medicaid Reimbursement to the New York City Department of Education"; and the Investigative Fund's discussion of SESIS in a November 14, 2011 article "Cost Estimate: Bringing in Private Companies to Do Public Work." Further publicity of the purported SESIS's failures occurred on March 1, 2012. On that date, Michael Mulgrew, the president for the United Federation of Teachers, gave testimony before the New York City Council Committees on Education and Finance concerning DOE's "failure to capitalize on Medicaid reimbursements for special education services" and the fact that "SESIS is plagued with problems." The record also contains several media stories published between 2011 and 2016 covering SESIS, including over a dozen stories in the education news provider, Chalkbeat; a New York Daily News' article, dated June 18, 2011, with the headline "$79 million special ed program's technical difficulties blamed for delay in kindergarten seating"; and a New York Times' article, dated March 1, 2016, with the headline "Thousands of New York City Students Deprived of Special-Education Services." Given that petitioner commenced this summary inquiry proceeding on February 8, 2016, some of these examples are dated, but others are not. Suffice it to say, they merely point to the fact that the SESIS issues have been raised and are well documented.

Footnote 14:DOE 2015 Annual Report on Special Education.

Footnote 15:NYC Comptroller's Audit Report on the Department of Education's Special Education Student Information System, Dated July 22, 2013.

Footnote 16:see https://perma.cc/8U2K-6XHP (last accessed Feb. 5, 2019).

Footnote 1:In Mitchel, the Second Department rejected a § 1109 application as premature, holding that it did not allege a basis for summary examination since the Board had not yet voted on the pending provision complained of by the petitioner (id. at 671-672). The court further found that a summary examination was inappropriate in that case because the applicants had other, more appropriate forms of relief, including a taxpayer lawsuit which had already been commenced and which sought a preliminary and permanent injunction of the proposed action (id. at 672).

Footnote 2:Because the allegations in Leich explicitly concerned corruption and violation of laws, the court had no need to, and did not, reach the issue of whether the provision applied to allegations of misconduct short of outright corruption.

Footnote 3:The Leich court noted that the provision "should not be narrowed in its scope," and touted its efficacy in promoting "purity and integrity in government. . . by the wholesome vigilance and meddlesomeness of the citizen" (31 Misc at 672). The court's description of the provision's purpose as being to permit citizens to "keep watch on the conduct of their officials" and to "prevent" official misbehavior suggests that the court interpreted the provision to promote governmental transparency and to permit an inquiry to proceed even where no corrupt act had taken place (id.). Therefore, the eloquent statement by the Leich court, quoted by the majority, about the historic background of the statute does not at all support the majority's contention that the court held that summary inquiries may only be made where corruption is alleged.

Footnote 4:In her application to the motion court, petitioner cited state, federal, and local laws and court orders which establish duties that she alleges respondents have violated or neglected, including: (1) the federal Individuals with Disabilities Education Act (IDEA), which requires, inter alia, that: (A) children with disabilities be provided with a "free and appropriate public education," including the provision of necessary services (20 USC § 1412[a][1], [5]), (B) local authorities produce information about the educational needs and achievements of students with disabilities (20 USC § 1414[c][2]), (C) local authorities regularly review IEPs to ensure that the goals for each child are met (20 USC § 1414[d][4]), and (D) children who transfer from one school to another promptly receive their IEP-mandated services (20 USC § 1414[d][2][C][ii]; see also 34 CFR 300.323[c][2]; D.D. v New York City Bd. Of Educ., 465 F3d 503, 508 [2d Cir 2006]); (2) the New York Education Law, which requires respondents to produce regular reports evaluating "educational effectiveness" (Education Law § 2590-h[10]-[11]); (3) so-ordered stipulations issued in Jose P. v Ambach (US Dist Ct, EDNY, 79 Civ 270, 1979) and Jose P. v Mills (US Dist Ct, EDNY, 96 Civ 1834, 2003), which require New York City to provide regular reports to the plaintiffs' attorneys on compliance with federal law regarding provision of services to children with disabilities; (4) New York City Charter § 333(a), which requires that each agency "monitor the performance of every contractor"; and (5) New York General Municipal Law § 100-a, which establishes a policy that contracts "assure the prudent and economical use of public moneys. . . and. . . facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost."

Footnote 5:In a footnote, the majority also cites Administrative Code of the City of New York Sections 14-115, 15-113, and 16-106, dealing with "neglect of duty" by police, firefighters, and sanitation workers, respectively. These provisions are also inapposite. Since the Charter is comparable to a state or federal constitution, the Administrative Code cannot be used to interpret the Charter (see New York City Charter § 28[a] [City Council "shall have power to adopt local laws which it deems appropriate, which are not inconsistent with the provisions of this charter or with the constitution or laws of the United States or this state"]; see also Revising City Charters In New York State, New York State Department of State 1998, reprinted 2015, available at https://www.dos.ny.gov /lg/publications/ Revising_City_Charters.pdf [last accessed Feb. 7, 2019]). Even if the Administrative Code provisions cited by the majority could be instructive as to the Charter's definition of "neglect of duty," each of the cited provisions qualifies that term with the following language: "or any conduct injurious to the public peace or welfare, or immoral conduct. . ., or any breach of discipline" (Administrative Code, Title 14 Police, § 14-115; see also New York City Administrative Code, Title 15 Fire Prevention and Control, § 15-113; New York City Administrative Code, Title 16 Sanitation, § 16-106). 

Footnote 6:On this appeal, respondents argue for the first time that 20 USC § 1414( c )(2) does not explicitly require the production of "computerized compliance data," and do not address any of the other sources of respondents' duties cited by petitioner, or dispute her allegation that respondents have violated or neglected their duties under them.

Footnote 7:I note that the majority does not identify any way in which the motion court has abused its discretion.

Footnote 8:The Comptroller also issued a report that addresses Medicaid reimbursement in 2014, but it does not address the problems with SESIS or indeed refer to SESIS at all.

Footnote 9:This assessment was presented to the motion court, but had not been published at the time the order appealed from was issued. Petitioner concedes that it is now publicly available.

Footnote 10:While the majority refers to "over a dozen" articles in the educational newsletter, Chalkbeat, only one, from 2014, is included in the record before us, and it does not mention SESIS at all. Similarly, the record contains only a portion of a June 18, 2011 Daily News article about delays in finding placements for kindergartners with special needs, and it does not mention SESIS. Finally, the 2016 New York Times article was based on the DOE's 2016 report and adds no new information.